*282 OPINION OF THE COURT
Chief Judge Wachtler.
In these two cases, we consider whether expert testimony that a complaining witness has exhibited behavior consistent with "rape trauma syndrome” is admissible at the criminal trial of the person accused of the rape. Both trial courts admitted the testimony and the Appellate Division affirmed in both cases. We now affirm in People v Taylor and reverse in People v Banks. While we recognize that the unchecked admission of expert testimony in this area has peculiar dangers, we believe that under certain circumstances and subject to certain limitations evidence of rape trauma syndrome is both relevant and admissible. We believe, however, that the trial court in Banks erred in allowing the expert to testify under the facts present in that case.
I. People v Taylor
On July 29, 1984, the complainant, a 19-year-old Long Island resident, reported to the town police that she had been raped and sodomized at gunpoint on a deserted beach near her home. The complainant testified that at about nine that evening she had received a phone call from a friend, telling her that he was in trouble and asking her to meet him at a nearby market in half an hour. Twenty minutes later, the same person called back and changed the meeting place. The complainant arrived at the agreed-upon place, shut off the car engine and waited. She saw a man approach her car and she unlocked the door to let him in. Only then did she realize that the person who had approached and entered the car was not the friend she had come to meet. According to the complainant, he pointed a gun at her, directed her to nearby Clarke’s Beach, and once they were there, raped and sodomized her.
The complainant arrived home around 11:00 p.m., woke her mother and told her about the attack. Her mother then called the police. Sometime between 11:30 p.m. and midnight, the police arrived at the complainant’s house. At that time, the complainant told the police she did not know who her attacker was. She was taken to the police station where she described the events leading up to the attack and again repeated that she did not know who her attacker was. At the conclusion of the interview, the complainant was asked to step into a private room to remove the clothes that she had been wearing at the time of the attack so that they could be *283 examined for forensic evidence. While she was alone with her mother, the complainant told her that the defendant John Taylor, had been her attacker. The time was approximately 1:15 a.m. The complainant had known the defendant for years, and she later testified that she happened to see him the night before the attack at a local convenience store.
Her mother summoned one of the detectives and the complainant repeated that the defendant had been the person who attacked her. The complainant said that she was sure that it had been the defendant because she had had ample opportunity to see his face during the incident. The complainant subsequently identified the defendant as her attacker in two separate lineups. He was arrested on July 31, 1984, and was indicted by the Grand Jury on one count of rape in the first degree, two counts of sodomy in the first degree and one count of sexual abuse in the first degree.
The defendant’s first trial ended without the jury being able to reach a verdict. At his second trial, the Judge permitted Eileen Treacy, an instructor at the City University of New York, Herbert Lehman College, with experience in counseling sexual assault victims, to testify about rape trauma syndrome. The prosecutor introduced this testimony for two separate purposes. First, Treacy’s testimony on the specifics of rape trauma syndrome explained why the complainant might have been unwilling during the first few hours after the attack to name the defendant as her attacker where she had known the defendant prior to the incident. Second, Treacy’s testimony that it was common for a rape victim to appear quiet and controlled following an attack, responded to evidence that the complainant had appeared calm after the attack and tended to rebut the inference that because she was not excited and upset after the attack, it had not been a rape. At the close of the second trial, the defendant was convicted of two counts of sodomy in the first degree and one count of attempted rape in the first degree and was sentenced to an indeterminate term of 7 to 21 years on the two sodomy convictions and 5 to 15 years on the attempted rape conviction.
II. People v Banks
On July 7, 1986, the defendant Ronnie Banks approached the 11-year-old complainant, who was playing with her friends in the City of Rochester. The complainant testified that the defendant told her to come to him and when she did not, he *284 grabbed her by the arm and pulled her down the street. According to the complainant, the defendant took her into a neighborhood garage where he sexually assaulted her. The complainant returned to her grandmother’s house, where she was living at the time. The next morning, she told her grandmother about the incident and the police were contacted. The defendant was arrested and charged with three counts involving forcible compulsion — rape in the first degree, sodomy in the first degree and sexual abuse in the first degree —and four counts that were based solely on the age of the victim — rape in the second degree, sodomy in the second degree, sexual abuse in the second degree and endangering the welfare of a child.
At trial, the complainant testified that the defendant had raped and sodomized her. In addition, she and her grandmother both testified about the complainant’s behavior following the attack. Their testimony revealed that the complainant had been suffering from nightmares, had been waking up in the middle of the night in a cold sweat, had been afraid to return to school in the fall, had become generally more fearful and had been running and staying away from home. Following the introduction of this evidence, the prosecution sought to introduce expert testimony about the symptoms associated with rape trauma syndrome.
Clearly, the prosecution, in an effort to establish that forcible sexual contact had in fact occurred, wanted to introduce this evidence to show that the complainant was demonstrating behavior that was consistent with patterns of response exhibited by rape victims. The prosecutor does not appear to have introduced this evidence to counter the inference that the complainant consented to the incident, since the 11-year-old complainant is legally incapable of consent (Penal Law § 130.05 [3] [a]). Unlike Taylor, the evidence was not offered to explain behavior exhibited by the victim that the jury might not understand; instead, it was offered to show that the behavior that the complainant had exhibited after the incident was consistent with a set of symptoms commonly associated with women who had been forcibly attacked. The clear implication of such testimony would be that because the complainant exhibited these symptoms, it was more likely than not that she had been forcibly raped.
The Judge permitted David Gandell, an obstetrician-gynecologist on the faculty of the University of Rochester, Strong *285 Memorial Hospital, with special training in treating victims of sexual assault, to testify as to the symptoms commonly associated with rape trauma syndrome. After Gandell had described rape trauma syndrome he testified hypothetically that the kind of symptoms demonstrated by the complainant were consistent with a diagnosis of rape trauma syndrome. At the close of the trial, the defendant was acquitted of all forcible counts and was convicted on the four statutory counts. He was sentenced to indeterminate terms of 3 Vi to 7 years on the rape and sodomy convictions and to definite one-year terms oh the convictions of sexual abuse in the second degree and endangering the welfare of a child.
III. Rape Trauma Syndrome
In a 1974 study rape trauma syndrome was described as "the acute phase and long-term reorganization process that occurs as a result of forcible rape or attempted forcible rape. This syndrome of behavioral, somatic, and psychological reactions is an acute stress reaction to a life-threatening situation” (Burgess & Holmstrom, Rape Trauma Syndrome, 131 Am J Psychiatry 981, 982 [1974]). Although others had studied the reactions of rape victims prior to this publication (see, e.g., Sutherland & Scherl, Patterns of Response Among Victims of Rape, 40 Am J Orthopsychiatry 503 [1970]), the Burgess and Holmstrom identification of two separate phases in a rape victim’s recovery has proven enormously influential.
According to Burgess and Holmstrom, the rape victim will go through an acute phase immediately following the incident. The behavior exhibited by a rape victim after the attack can vary. While some women will express their fear, anger and anxiety openly, an equal number of women will appear controlled, calm, and subdued (Burgess & Holmstrom, op. cit., at 982). Women in the acute phase will also experience a number of physical reactions. These reactions include the actual physical trauma that resulted from the attack, muscle tension that could manifest itself in tension headaches, fatigue, or disturbed sleep patterns, gastrointestinal irritability and genitourinary disturbance (id.). Emotional reactions in the acute phase generally take the form of fear, humiliation, embarrassment, fear of violence and death, and self-blame (id., at 983).
As part of the long-term reorganizational phase, the victim will often decide to make a change in her life, such as a change of residence. At this point, the woman will often turn *286 to her family for support (id.). Other symptoms that are seen in this phase are the occurrence of nightmares and the development of phobias that relate to the circumstances of the rape (id., at 984). For instance, women attacked in their beds will often develop a fear of being indoors, while women attacked on the street will develop a fear of being outdoors (id.).
While some researchers have criticized the methodology of the early studies of rape trauma syndrome, Burgess and Holmstrom’s model has nonetheless generated considerable interest in the response and recovery of rape victims and has contributed to the emergence of a substantial body of scholarship in this area (see, e.g., Nadelson, Notman, Zackson & Gornick, A Follow-up Study of Rape Victims, 139 Am J Psychiatry 1266 [1982]; Ruch, Chandler & Harter, Life Change and Rape Impact, 21 J Health & Social Behavior 248 [1980]; Kilpatrick, Veronen & Resick, The Aftermath of Rape: Recent Empirical Findings, 49 Am J Orthopsychiatry 658 [1979]; Notman & Nadelson, The Rape Victim: Psychodynamic Considerations, 133 Am J Psychiatry 408 [1976]; see generally, Symonds, Victims of Violence: Psychological Effects and Aftereffects, 35 Am J Psychoanalysis 19 [1975]; Note, Checking the Allure of Increased Conviction Rates: The Admissibility of Expert Testimony on Rape Trauma Syndrome in Criminal Proceedings, 70 Va L Rev 1657, 1667-1680 [summarizing the research in the field and criticizing the reliability of rape trauma syndrome studies]). The question before us today, then, is whether the syndrome, which has been the subject of study and discussion for the past 16 years, can be introduced before a lay jury as relevant evidence in these two rape trials.
We realize that rape trauma syndrome encompasses a broad range of symptoms and varied patterns of recovery. Some women are better able to cope with the aftermath of sexual assault than other women (see, e.g., Ruch, Chandler & Harter, op. cit., at 253). It is also apparent that there is no single typical profile of a rape victim and that different victims express themselves and come to terms with the experience of rape in different ways. We are satisfied, however, that the relevant scientific community has generally accepted that rape is a highly traumatic event that will in many women trigger the onset of certain identifiable symptoms (see, Frye v United States, 293 F 1013; People v Hughes, 59 NY2d 523, 537).
We note that the American Psychiatric Association has *287 listed rape as one of the stressors that can lead to posttraumatic stress disorder (American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 247, 248 [3d ed rev 1987] [DSM III-R]). According to DSM III-R, there is an identifiable pattern of responses that can follow an intensely stressful event. The victim who suffers from posttraumatic stress disorder will persistently reexperience the traumatic event in a number of ways, as through dreams, flashbacks, hallucinations, or intense distress at exposure to events that resemble or symbolize the traumatic event (id,., at 250). The victim will also avoid stimuli that he or she associates with the trauma (id.). Finally, the victim will experience "persistent symptoms of increased arousal,” which could include difficulty in falling or staying asleep, sudden outbursts of anger, or difficulty concentrating (id.). While the diagnostic criteria for posttraumatic stress disorder that are contained in DSM III-R have convinced us that the scientific community has accepted that rape as a stressor can have marked, identifiable effects on a victim’s behavior, we would further note that although rape trauma syndrome can be conceptualized as a posttraumatic stress disorder (see, Nadelson, Notman, Zackson & Gornick, op. cit, at 1267), victims of rape will often exhibit peculiar symptoms — like a fear of men — that are not commonly exhibited by victims of other sorts of trauma (see generally, Massaro, Experts, Psychology, Credibility, and Rape: The Rape Trauma Syndrome Issue and Its Implications for Expert Psychological Testimony, 69 Minn L Rev 395, 447).
We are aware that rape trauma syndrome is a therapeutic and not a legal concept. Physicians and rape counselors who treat victims of sexual assault are not charged with the responsibility of ascertaining whether the victim is telling the truth when she says that a rape occurred. That is part of the truth-finding process implicated in a criminal trial. We do not believe, however, that the therapeutic origin of the syndrome renders it unreliable for trial purposes. Thus, although we acknowledge that evidence of rape trauma syndrome does not by itself prove that the complainant was raped, we believe that this should not preclude its admissibility into evidence at trial when relevance to a particular disputed issue has been demonstrated.
IV. The Law
Having concluded that evidence of rape trauma syndrome is *288 generally accepted within the relevant scientific community, we must now decide whether expert testimony in this area would aid a lay jury in reaching a verdict. "[Ejxpert opinion is proper when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror” (De Long v County of Erie, 60 NY2d 296, 307). In Matter of Nicole V. (71 NY2d 112), we described the "sexually abused child syndrome” as "a recognized diagnosis based upon comparisons between the characteristics of individuals and relationships in incestuous families * * * and the characteristics of the individuals and relationships of the family in question” (id., at 120-121), and held that in a Family Court child protection proceeding, the Judge could receive expert testimony describing the syndrome and the victim’s conduct consistent with it was properly admitted to satisfy the corroboration requirements of Family Court Act § 1046 (a) (vi). In People v Keindl (68 NY2d 410, 422), we held that the Trial Judge had not abused his discretion by allowing an expert to testify to the range of psychological reactions suffered by children who had been the victim of sexual abuse by their stepparents to rebut defendant’s attempt to impair the credibility of the victims by evidence that they had not promptly complained of the crimes. In People v Henson (33 NY2d 63), we held that evidence of "battered child syndrome”, based as it was on objective evidence of injuries and the idiosyncratic nature of those resulting from battering, was admissible at the trial of a mother and father accused and convicted of criminally negligent homicide in the death of their four-year-old son where the parents had contended that the child’s injuries were accidental. We have upheld the admission of expert testimony in these child abuse cases despite the fact that childrearing and family life are familiar to the lay juror because the dynamics of sexually and physically abusive relationships within a family are not as familiar.
Similarly, rape is a crime that is permeated by misconceptions (see generally, Brownmiller, Against Our Will: Men, Women and Rape, at 343-350; Estrich, Rape, 95 Yale LJ 1087). Society and law are finally realizing that it is an act of violence and not a sexual act. We noted in People v Liberta (64 NY2d 152, 166, n 8) that "[t]he stigma and other difficulties associated with a woman reporting a rape and pressing charges probably deter most attempts to fabricate an incident; rape remains a grossly under-reported crime”. Studies have shown that one of the most popular misconceptions about rape *289 is that the victim by behaving in a certain way brought it on herself (see, Massaro, op. cit., at 404). For that reason, studies have demonstrated that jurors will under certain circumstances blame the victim for the attack and will refuse to convict the man accused (id.). Studies have also shown that jurors will infer consent where the victim has engaged in certain types of behavior prior to the incident (id., at 405-406).
Traditionally, the criminal justice system treated rape differently from other crimes. For instance, many jurisdictions required corroboration of the rape victim’s testimony, even though no such corroboration was required for other violent crimes (Comment, Expert Testimony on Rape Trauma Syndrome: Admissibility and Effective Use in Criminal Rape Prosecution, 33 Am U L Rev 417, 449). In addition, Judges in some jurisdictions gave special instructions in rape cases cautioning the jury to view the prosecution’s case with skepticism (id.), because, as noted by Sir Matthew Hale in the 17th century, rape was "an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho’ never so innocent” (1 Hale, History of Pleas of the Crown, at 635).
Because cultural myths still affect common understanding of rape and rape victims and because experts have been studying the effects of rape upon its victims only since the 1970’s, we believe that patterns of response among rape victims are not within the ordinary understanding of the lay juror. For that reason, we conclude that introduction of expert testimony describing rape trauma syndrome may under certain circumstances assist a lay jury in deciding issues in a rape trial.
In reaching our conclusions in this area, we note that an extensive body of case law has developed concerning the admissibility of this type of evidence. There is no uniform approach to the admission of evidence of rape trauma syndrome among the States that have considered the question. The Minnesota Supreme Court in one of the earliest rape trauma syndrome cases held such evidence inadmissible (State v Saldana, 324 NW2d 227). In Saldana, the defendant admitted that sexual intercourse had occurred, but he maintained that it had been consensual. In order to rebut his claim that the victim had consented, the prosecution introduced an expert witness who described rape trauma syndrome and gave her opinion that the complaining witness had been raped and *290 had not fantasized the incident. According to the court, "such testimony is of no help to the jury and produces an extreme danger of unfair prejudice” (id., at 229). Further, the testimony that the complainant had not fantasized the incident was held to invade the jury’s province to make credibility determinations (id., at 232).
California has similarly held that evidence of rape trauma syndrome is inadmissible to prove that a rape occurred (People v Bledsoe, 36 Cal 3d 236, 681 P2d 291). The court noted in dicta, however, that where evidence of rape trauma syndrome was oifered not to prove that a rape had occurred, but to explain conduct of the victim after the incident that may appear inconsistent with a claim of rape, "expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths” (36 Cal 3d, at 457, 681 P2d, at 298). Other States that have refused to allow the admission of expert testimony on rape trauma syndrome include Missouri (State v Taylor, 663 SW2d 235), Washington (State v Black, 109 Wash 2d 336, 745 P2d 12; but see, State v Ciskie, 110 Wash 2d 263, 751 P2d 1165 [evidence of battered woman syndrome admissible to explain why victim remained in abusive relationship and failed to report abuse to authorities; syndrome described as subgroup of posttraumatic stress disorder]), and Pennsylvania (Commonwealth v Gallagher, 519 Pa 291, 547 A2d 355).
Among those States that have allowed such testimony to be admitted, the purpose for which the testimony was oifered has proven crucial. A number of States have allowed testimony of rape trauma syndrome to be admitted where the defendant concedes that sexual intercourse occurred, but contends that it was consensual. The Kansas Supreme Court held in State v Marks (231 Kan 645, 647 P2d 1292) that "if the presence of rape trauma syndrome is detectable and reliable as evidence that a forcible assault did take place, it is relevant when a defendant argues the victim consented to sexual intercourse. As such an expert’s opinion does not invade the province of the jury. It is merely oifered as any other evidence, with the expert subject to cross-examination and the jury left to determine its weight” (id., at 655, at 1299). In State v McCoy (366 SE2d 731), the West Virginia Supreme Court of Appeals, concerned that the expert would impermissibly vouch for the credibility of the complainant on the critical issue of whether *291 the rape had occurred, drew a distinction between permitting an expert to testify that the victim exhibited behavior consistent with the syndrome and permitting him or her to testify that he or she believed that the victim had been raped. The court concluded that where consent is a defense to a rape charge, qualified expert testimony on rape trauma syndrome is relevant and admissible, but the expert may testify only that the complainant exhibits behavior consistent with the syndrome and may not give any sort of explicit or implicit opinion that the complainant had been raped (id., at 737). States that have permitted the admission of rape trauma syndrome evidence where the defense is consent include Maryland (State v Allewalt, 308 Md 89, 517 A2d 741 [testimony referred to "posttraumatic stress disorder” and not "rape trauma syndrome”]), Arizona (State v Huey, 145 Ariz 59, 699 P2d 1290), Montana (State v Brodniak, 221 Mont 212, 718 P2d 322; State v Liddell, 211 Mont 180, 685 P2d 918), and Iowa (State v Gettler, 438 NW2d 1 [testimony referred to "posttraumatic stress disorder” and not "rape trauma syndrome”]).
Other States have permitted the admission of this testimony where it was offered to explain behavior exhibited by the complainant that might be viewed as inconsistent with a claim of rape. In People v Hampton (746 P2d 947), the Colorado Supreme Court held that in a case where the complainant waited 89 days to report an attack, expert testimony that a rape victim who is assaulted by someone she knows is more reluctant to report an attack was admissible to explain the delay in reporting (id., at 952). The court noted that such evidence is not conclusive of rape, but that "[a]ny flaws present in the expert testimony go to the weight to be given the evidence rather than its admissibility and can be the subject of cross-examination of the expert witness” (id.). Other States that have permitted the admission of expert testimony of this type to explain inconsistencies in the behavior of the complainant, especially where a child is involved, include Indiana (Simmons v State, 504 NE2d 575 [rape trauma syndrome evidence offered to explain inconsistencies in the victim’s testimony including certain lies she told following the incident]), Oregon (State v Middleton, 294 Ore 427, 657 P2d 1215 [expert testimony regarding response of child victim to rape by family member held admissible; no discussion of rape trauma syndrome per se]), Hawaii (State v Kim, 64 Haw 598, 645 P2d 1330 [expert testimony regarding response of child victim to sexual abuse admitted to rehabilitate 13-year-old *292 complainant after her credibility had been attacked; no discussion of rape trauma syndrome per se]), New Hampshire (State v Staples, 120 NH 278, 415 A2d 320 [expert testimony admitted to show that victim’s memory loss could have resulted from rape and not intoxication]), Delaware (Wheat v State, 527 A2d 269 [held expert testimony admissible to explain delay in reporting or recantation by child victim, but expressly declined to extend holding to adult victims]), Connecticut (State v Spigarolo, 210 Conn 359, 556 A2d 112 [where child victim’s credibility has been impeached, expert testimony admissible to explain that it is common for children to tell inconsistent stories or recant earlier stories]), and Vermont (State v Hicks, 148 Vt 459, 535 A2d 776 [child victim; offered to explain delay in reporting]).
Having concluded that evidence of rape trauma syndrome can assist jurors in reaching a verdict by dispelling common misperceptions about rape, and having reviewed the different approaches taken by the other jurisdictions that have considered the question, we too agree that the reason why the testimony is offered will determine its helpfulness, its relevance and its potential for prejudice. In the two cases now before us, testimony regarding rape trauma syndrome was offered for entirely different purposes. We conclude that its admission at the trial of John Taylor was proper, but that its admission at the trial of Ronnie Banks was not.
As noted above, the complaining witness in Taylor had initially told the police that she could not identify her assailant. Approximately two hours after she first told her mother that she had been raped and sodomized, she told her mother that she knew the defendant had done it. The complainant had known the defendant for years and had seen him the night before the assault. We hold that under the circumstances present in this case, expert testimony explaining that a rape victim who knows her assailant is more fearful of disclosing his name to the police and is in fact less likely to report the rape at all was relevant to explain why the complainant may have been initially unwilling to report that the defendant had been the man who attacked her. Behavior of this type is not within the ordinary understanding of the jury and testimony explaining this behavior assists the jury in determining what effect to give to the complainant’s initial failure to identify the defendant (see, People v Keindl, supra). This evidence provides a possible explanation for the com *293 plainant’s behavior that is consistent with her claim that she was raped. As such, it is relevant.
Rape trauma syndrome evidence was also introduced in Taylor in response to evidence that revealed the complainant had not seemed upset following the attack. We note again in this context that the reaction of a rape victim in the hours following her attack is not something within the common understanding of the average lay juror. Indeed, the defense would clearly want the jury to infer that because the victim was not upset following the attack, she must not have been raped. This inference runs contrary to the studies cited earlier, which suggest that half of all women who have been forcibly raped are controlled and subdued following the attack (Burgess & Holmstrom, op. cit., at 982). Thus, we conclude that evidence of this type is relevant to dispel misconceptions that jurors might possess regarding the ordinary responses of rape victims in the first hours after their attack. We do not believe that evidence of rape trauma syndrome, when admitted for that express purpose, is unduly prejudicial.
The admission of expert testimony describing rape trauma syndrome in Banks, however, was clearly error. As we noted earlier, this evidence was not offered to explain behavior that might appear unusual to a lay juror not ordinarily familiar with the patterns of response exhibited by rape victims. We conclude that evidence of rape trauma syndrome is inadmissible when it inescapably bears solely on proving that a rape occurred, as was the case here.
Although we have accepted that rape produces identifiable symptoms in rape victims, we do not believe that evidence of the presence, or indeed of the absence, of those symptoms necessarily indicates that the incident did or did not occur. Because introduction of rape trauma syndrome evidence by an expert might create such an inference in the minds of lay jurors, we find that the defendant would be unacceptably prejudiced by the introduction of rape trauma syndrome evidence for that purpose alone. We emphasize again that the therapeutic nature of the syndrome does not preclude its admission into evidence under all circumstances. We believe, however, that its usefulness as a fact-finding device is limited and that where it is introduced to prove the crime took place, its helpfulness is outweighed by the possibility of undue prejudice. Therefore, the trial court erred in permitting the admission of expert testimony regarding rape trauma syn *294 drome under the facts present in Banks (see, De Long v County of Erie, supra, at 307).
On this record, we cannot conclude that the introduction of the evidence of rape trauma syndrome evidence in People v Banks was harmless error. Accordingly, in People v Banks, the order of the Appellate Division should be reversed and a new trial ordered.
We have considered defendant John Taylor’s other arguments and we conclude that they are without merit. The order of the Appellate Division in People v Taylor should therefore be affirmed.
Judges Simons, Kaye, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
In People v Taylor: Order affirmed.
Judges Simons, Kaye, Titone, Hancock, Jr., and Bellacosa concur; Judge Alexander taking no part.
In People v Banks: Order reversed and a new trial ordered.