**UNITED STATES of America, Plaintiff,**

v.

**FUNDS HELD IN THE NAME OR FOR THE BENEFIT OF JOHN HUGH WETTERER, and/ or Asociacion Amigos Del Los Ninos Hogar Mi Casa, a/k/a Mi Casa, at Bank of America International, Lloyds Bank International and Sterling Bank, including but not limited to Bank of America Account Numbers if 1119–9984, 162232 IBF, 10201–01–1, and 6–58–05616, Lloyds Bank International Bank Number 00070891 (Nassau Branch) and Sterling Bank Account Numbers 907–103 and CD 15590 and all Related Accounts and Funds, Defendants.**

No. CV 91–0234(ADS).

United States District Court, E.D. New York.

Jan. 15, 1998.

Zachary W. Carter, Office of the U.S. Atty. for the Eastern District of New York by Arthur P. Hui and Susan L. Riley, Asst, U.S. Attys., Brooklyn, NY, for plaintiff.

June Resnick German, Huntington, NY, Stanley L. Shapiro, Miller Place, NY, for defendant.

## AMENDED MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

### I. BACKGROUND

The "Asociacion Amigos Del Los Ninos Hogar Mi Casa," (the "Asociacion") is a not-for-profit corporation incorporated under the laws of Guatemala on July 10, 1984, with its main offices located in Guatemala City. According to its By–Laws, the objective of the Asociacion is to promote the welfare of orphaned or abandoned children in Guatemala by providing them with food, shelter, education and other support services. Among

the facilities for children run by the Asociacion is a residential orphanage for boys in Guatemala City, named "Mi Casa." Until 1991, John Hugh Wetterer, a United States citizen and decorated Vietnam war hero, served as President of the Asociacion's Board and as Director General of Mi Casa. In those capacities, he directed the daily operations of the orphanage. By 1988, Mi Casa housed approximately 250 Guatemalan boys who either had been living on the streets, or with their impoverished families who were unable to care for them.

The Asociacion maintains a Texas Board of Directors ("Texas Board"), whose purpose is to allow donations from the United States to receive tax exempt status. Until November 1988, funds for Mi Casa were solicited in the United States and elsewhere under the auspices of the American Friends of Children ("AFC"). AFC is the successor organization to American Friends of Vietnamese Children, founded in 1970 by Wetterer and Dan Mackey ("Mackey"), a Long Island resident and former New York City Police Officer. According to Mackey, who served as AFC's treasurer, Wetterer solicited donations by sending a monthly letter on AFC stationary to sponsors and potential donors informing and updating them of events and occurrences at Mi Casa. Donations were made to AFC, and sent in a return envelope provided by it to AFC's post office box number in Massapequa, New York. AFC would then deposit the donations in Bank of America Account No. 05616, located in Florida and held in the name of the Asociacion. Subsequent to deposit, Wetterer would arrange a transfer of the funds to Guatemala. From 1977 through 1988, Mackey estimates that AFC collected and disbursed over one million dollars to Wetterer.

In October 1988, "60 Minutes," the well-known television news program broadcast by CBS, was preparing to air a segment favorably showcasing Mi Casa and Wetterer's successful fund-raising efforts on its behalf. When Mary Tyre, one of Mi Casa's many American benefactors, learned of the planned episode, she contacted the show and reported that a former resident of Mi Casa, Leonel Piedrasanta, was living with her in the United States, and that Wetterer had sexually abused him and several other Mi Casa orphans.

In response, "60 Minutes" retained Dr. Simon Miranda, a psychologist, to investigate the claims of sexual abuse and to possibly report his findings on the program. An expert in forensics, Dr. Miranda has evaluated more than 3,000 claims of sexual abuse, and testified as an expert in judicial proceedings on at least one hundred occasions. At the request of CBS, Dr. Miranda eventually interviewed more than a half-dozen individuals who had resided at Mi Casa, and concluded that Wetterer was sexually abusing the Mi Casa orphans. The doctor announced his findings during a televised episode of "60 Minutes."

"60 Minutes" relayed Dr. Miranda's conclusions to the AFC Board. The Board attempted to conduct its own inquiry, but allegedly was stymied when Wetterer prevented AFC's investigator from conducting any meaningful interviews of the alleged victims. Consequently, AFC barred Wetterer from using its letterhead to raise funds for Mi Casa, and stopped sending donations to him.

In 1989, the United States Postal Service ("Postal Service") began its own investigation into the allegations of sexual abuse. According to the Government, the investigation, led by Postal Inspector John McDermott ("McDermott"), allegedly revealed that Wetterer was a pedophile who regularly molested the young boys residing at Mi Casa. McDermott's investigation further uncovered information leading the Postal Service to conclude that at the time Wetterer was abusing the orphans, his monthly letters to sponsors and donors in the United States falsely represented that the donations were helping to provide a healthy and stable environment for them. McDermott also discovered that on several occasions, Wetterer brought some of the orphans to Disney World in Florida, allegedly to sexually molest them, or to reward them for such activity. Finally, McDermott learned that Wetterer was continuing to solicit donations for Mi Casa through the United States mail. According to McDermott, beginning in early 1989, Wetterer started using a letterhead that resembled AFC's to solicit

donations, and listed a Texas post office box as the place to forward the donations.

On September 14, 1990, the Government filed a criminal complaint against Wetterer, resulting in two indictments and a warrant. for his arrest. The first indictment charged a violation of the mail fraud statute, 18 U.S.C. § 1341, based on Wetterer's alleged fraudulent representations in the solicitation letters that Mi Casa offered a healthy environment for its residents. The second indictment was for theft and conversion of funds, based on certain transfers of funds Wetterer made to his brother. Wetterer was notified of the arrest warrant but refused to appear and answer the charges filed against him. He was, and remains, a fugitive in Guatemala, a country with which the United States does not have an extradition treaty covering these offenses. ·

On January 22, 1991, the United States commenced this civil action, seeking the forfeiture of certain bank accounts held in the name of the Asociacion or Wetterer pursuant to 18 U.S.C. § 981. The *in rem* complaint listed as the alleged crimes underlying the basis for the seizure mail fraud, 18 U.S.C. § 1341, and inducing a person to travel in interstate or foreign commerce for the purpose of engaging in criminal sexual activity, 18 U.S.C. § 2422. An arrest warrant *in rem* authorizing the seizure of the bank accounts was issued that same day.

In a decision rendered on September 15, 1995, this Court adopted the Report and Recommendation of United States Magistrate Judge A. Simon Chrein, which found that Wetterer controlled the Asociacion's financial transactions, that he used the bank accounts in Florida and Texas to further his own ends, that he remained president of the corporation, and that civil forfeiture was not independent of the criminal case pending against Wetterer, but was based on the same underlying crimes. Accordingly, this Court concluded that the Asociacion was Wetterer's "alter ego," and that the corporation was disentitled from pursuing its claims as to forfeiture of the bank accounts in the name of the corporation or allegedly for the use and benefit of the corporation. *United States v. Funds Held in the Name or for the Benefit of John Hugh Wetterer*, 899 F.Supp. 1013 (E.D.N.Y.1995).

Presently before the Court are the defendants' motion to strike the following evidence from the trial record: (1) the transcript and .tape-recording of Dr. Miranda's interview of Leonel Piedrasanta, the former Mi Casa orphan who alleged that Wetterer sexually molested him; (2) Dr. Miranda's testimony regarding the allegations of sexual abuse by Piedrasanta and five other victims, told to the doctor during "interviews," "evaluations" and "conversations;" (3) the expert testimony of Dr. Miranda explaining why victims of sexual abuse sometimes recant; and (4) the expert testimony of Dr. Miranda and FBI Supervisory Special Agent Kenneth V. Lanning regarding the reasons why victims sometimes delay reporting the sexual abuse.

The Court begins by outlining the testimony and evidence offered at trial, limited to the issues at hand. The Court notes the Government's position that Dr. Miranda conducted "evaluations" of some alleged victims, and in other cases, merely "interviewed" them. The Government never explains the distinction between an "evaluation" and an "interview." Nevertheless, it is the Court's understanding that, in this case, an "evaluation" connotes a comprehensive meeting with, and questioning of, the victim, whereas an "interview" indicates an informal, less thorough conversation with the victim.

### A. Dr. Miranda's Testimony Regarding his "Evaluation" of Leonel Piedrasanta

At the request of "60 Minutes," Dr. Miranda conducted a tape-recorded "evaluation" of Leonel Piedrasanta in the doctor's Miami office in November 1988 (Miranda: Tr. 677, 1138, 1165, 1339–41). At the time, Leonel was "19 or 20, in that age range" and living with Tyre, his American sponsor, in the United States (Miranda: Tr. 677, 1217). The doctor met with Leonel two more times: once in November, 1988, when Leonel accompanied the doctor and "60 Minutes" staff to Guatemala, and again in March, 1989, in the doctor's office (Miranda: Tr. 1138–39, 1166). A New York Newsday reporter, Richard

Firstman, attended the March 1989 evaluation (Miranda: Tr. 1140, 1165–66).

According to Dr. Miranda, during the evaluation, Leonel said that over a six to eight year period when he resided at Mi Casa, Wetterer repeatedly sexually abused him by "having [me] penetrate him anally, placing [me] on [my] back and making thrusts with his—his meaning Mr. Wetterer's buttocks, toward [me], fondling [my] penis." The doctor testified that Leonel told him that he would pretend to be asleep during the incidents (Miranda: Tr. 678–81, 1165, 1204–06, 1255, 1263–65; Transcripts C and D of November 1, 1988 Interview Between Dr. Miranda and Leonel Piedrasanta). As a result of the evaluation, Dr. Miranda concluded "[t]hat within a reasonable degree of psychological probability, [Leonel] was ... a victim, a bona fide victim." (Miranda: Tr. 678, 684). When asked what he based that conclusion on, the doctor testified:

> I based it on—the entire corpus of information that he gave me, both in terms of verbal statements that he made, his—the rendition, his demeanor while he talked to me, the, the additional information that he gave in terms of in the—in terms of the plausibility of the behavior of what he was describing, and just the usual analysis that I would make of the information before me. The verbal content, the emotional dimension in him, and then applying, of course, my knowledge and experience of this kind of a problem, and how what he was providing me with compared to that knowledge based on what I have had with respect to such problems.

(Miranda: Tr. 678). Leonel did not testify at the trial.

### B. Dr. Miranda's Trips to Guatemala

#### i. The First Trip

Following the evaluation of Leonel, Dr. Miranda relayed his conclusion of sexual abuse to a "60 Minutes" producer and television reporter, Diane Sawyer (Miranda: Tr. 699). Thereafter, the doctor traveled twice to Guatemala, at the expense of CBS, to interview other potential victims (Miranda: Tr. 699–700, 1138). During the first trip, in November 1988, the doctor was accompanied by a CBS producer and her assistant (Miranda: Tr. 1184–85). At that time, the doctor did not interview any of the Mi Casa orphans, although he had an informal conversation with Hugo Piedrasanta, Leonel's brother (Miranda: Tr. 700, 1184–85, 1357).

#### ii. The Second Trip

##### (1) The Hugo Piedrasanta "Conversation"

Toward the end of 1988 or the beginning of 1989, the doctor made a second trip to Guatemala, accompanied by "60 Minutes" staff and Leonel Piedrasanta (Miranda: Tr. 1186–87, 1201). There, the doctor spoke with Hugo Piedrasanta after the pair dined at a restaurant with "60 Minutes" personnel and others. The doctor acknowledged that the casual conversation, while walking down the street immediately following the meal, "wasn't really an interview. I did not take notes ... and it did not develop into an interview as such." (Miranda: Tr. 701, 1185, 1356). During their walk, Hugo confided that "he had been fondled by Mr. Wetterer." (Miranda: Tr. 702, 1185–86). No testimony was elicited as to whether Hugo told the doctor when the reported abuse occurred, where the abuse occurred, how old Hugo was at the time of the purported sexual encounter or at the time of the interview, how long Hugo resided at the orphanage, or whether he was living there at the time of the interview. In addition, the doctor testified that, "I think [at] some point down the road I learned he [Hugo] had recanted," an occurrence that, in the doctor's view, "is not uncommon, particularly in cases of incest or where there is a special type of relationship between the alleged offender and the alleged victim" (Miranda: Tr. 702–04, 1261). Hugo Piedrasanta did not testify at the trial.

##### (2) The Jose Luis Melendez and Rotilio Sanchez "Interviews"

During his second trip to Guatemala, Dr. Miranda conducted unrecorded "interviews" of Jose Luis Melendez and Rotilio Sanchez (Miranda: Tr. 1350, 1357). The doctor did not specify: the subject of the interviews; when the interviews occurred; where the interviews occurred, or; who else, if anyone, was present during the interviews. Never-

theless, according to the doctor, they were "victims" who "alleged molestation," and who "gave in my opinion reliable statements." (Miranda: Tr. 695, 704, 1253). The Government did not elicit testimony as to: when Melendez and Sanchez resided at Mi Casa; whether they were living at the orphanage at the time of the interviews; their age at the time of the "molestation;" their age at the time of the interviews; what acts constituted "molestation;" and how, when, or where the alleged "molestations" occurred. Neither Melendez nor Sanchez testified at the trial.

## C. Dr. Miranda's Testimony Regarding the "Evaluation" of Manuel Bravo

On March 1, 1989, Dr. Miranda was present while Firstman, the New York Newsday reporter, questioned former Mi Casa resident Manuel Bravo during a two-hour, tape-recorded interview in the doctor's office. Firstman led the interview, although the doctor participated by asking some questions (Miranda: Tr. 685–86, 1140–42, 1167–68, 1219, 1222). The doctor was unsure why he even was present, except perhaps to make Bravo feel more comfortable while he related his story to the reporter (Miranda: Tr. 1223). Dr. Miranda admitted that it was "not common practice" for a reporter to be present while a psychologist "evaluated" allegations of sexual abuse, much less for the journalist to conduct the questioning (Miranda: Tr. 1222). The doctor permitted the reporter to control the "evaluation" even though, in the doctor's experience, the method and nature of questioning a child abuse victim is "vital" in determining the victim's responses, and an evaluator can, in some instances, "force" the subject to make untrue allegations of sex abuse by manipulating the nature of the questions asked (Miranda: Tr. 1191–92).

During the meeting, Manuel told the reporter and doctor, that when he was approximately twelve years old, Wetterer invited him into his private quarters at Mi Casa, instructed him to shower, dried him off, and fondled him. The doctor concluded that what Manuel said was "true" because his recollections of the abuse were "richly detailed" and "compelling" (Miranda: Tr. 689–

692, 695, 1220, 1224, 1264). Bravo testified to the abuse at the trial.

## D. Dr. Miranda's Testimony Regarding his Interview/Evaluation of Jose Luis Lutin

In September 1990, Dr. Miranda interviewed Jose Luis Lutin in the doctor's Miami office (Miranda: Tr. 693). Lutin told the doctor that when he was twelve years old and living at Mi Casa, Wetterer invited him into his quarters, and molested him in a manner similar to that described by Manuel Bravo (Miranda: Tr. 695–98). Based on the interview, the doctor concluded, "with a reasonable degree of psychological certainty," that Lutin's accusation of sexual abuse was "unusually compelling, both in the richness of the details, the fact that he could reflect on his mental processes while this event was taking place, and also in terms of the manner in which he recounted this event.... The pauses, the kind of stuttering, the aversive way of ... looking down, looking away, and feeling very comfortable but clearly struggling while describing this experience." (Miranda: Tr. 698–99).

When asked on cross-examination whether he "provide[d] therapy to any of the accusers," Dr. Miranda responded, "Yes .... Jose Luis [Lutin]." (Miranda: Tr. 1096). No testimony was elicited as to: (1) what Dr. Miranda meant by "therapy"; (2) what was the object of the "therapy"—i.e. whether it was for sexual abuse, or another matter; or (3) whether the "therapy" was provided during the September 1990 evaluation session, when Lutin told the about the sexual abuse by Wetterer, or during the "two or three" other occasions when the doctor and Lutin met (Lutin: Tr. 1056).

Lutin testified about the abuse at the trial. The defense offered into evidence at trial the transcript of Dr. Miranda's interview of Lutin (Defendants' Exhibit AI).

## E. The Expert Testimony Regarding Delayed Reporting of Sexual Abuse

Dr. Miranda testified that, in his experience, it is "not in the least unusual" for sexual abuse to go unreported (Miranda: Tr. 682–84). Dr. Miranda explained that there

are numerous reasons for victims to conceal the abuse, including that disclosure is difficult because sex abuse is considered "taboo," and because victims often feel guilty, shameful and fearful of reprisals or punishment (Miranda: Tr. 682–84).

The Government also offered the testimony of Kenneth V. Lanning, a Supervisory Special Agent of the Federal Bureau of Investigations, and an expert in the field of sexual abuse (Lanning: Tr. 1325). Agent Lanning testified that, in his experience, young boys are the least likely of child sexual abuse victims to report the incident and the most likely to deny that they were abused when asked (Lanning: Tr. 1328). The victims' reluctance to disclose is generally attributable to four factors: (1) the "stigma" of homosexuality where both the abuser and victim are male; (2) fear that society will condemn the victim for not fending off the abuser and for not reporting it immediately; (3) many victims like and/or depend on the abuser, and do not want to get him in trouble; and (4) some victims fear the abuser (Lanning: Tr. 1329–31).

## II. THE COURT'S RULINGS AT TRIAL

At trial, this Court struck Dr. Miranda's testimony that the alleged victims were credible witnesses and were telling the truth about Wetterer abusing them (T. 859, 863–64). Neither party has invited the Court to reconsider this decision, and the Court adheres to it.

## III. THE PARTIES' POSITIONS

Presently before the Court are the defendants' motion to strike the transcript and tape-recording of Dr. Miranda's interviews of Leonel Piedrasanta, as well as Dr. Miranda's testimony concerning the accusations of sexual abuse by the six alleged victims. The defense claims that these statements of sexual abuse constitute inadmissible hearsay which does not fall within the Government's proffered exceptions, Rules 703 and 803(4) of the Federal Rules of Evidence, because Dr. Miranda neither treated nor diagnosed any of the alleged victims. The defense also claims that Dr. Miranda's testimony should be stricken because he was a biased and

inaccurate witness, and because the defense was deprived of the opportunity to cross-examine four of the declarants: Jose Luis Melendez, Rotilio Sanchez, Hugo Piedrasanta and Leonel Piedrasanta. The defense also moves to strike the expert testimony of Dr. Miranda and Agent Lanning regarding reasons for recantation and delayed reporting of sexual abuse, on the ground that their conclusions are within the common knowledge of the trier of fact.

On the other hand, the Government contends that the transcript and recording of Dr. Miranda's interview of Leonel Piedrasanta, and all of the alleged victims' statements to Dr. Miranda, are admissible under Fed.R.Evid. 703 because they formed the basis of Dr. Miranda's expert opinion that Wetterer was sexually abusing the boys at Mi Casa. The Government also contends that the statements of three victims—Leonel Piedrasanta, Manuel Bravo, and Jose Luis Lutin—fall within the hearsay exception embodied in Fed.R.Evid. 803(4) because they were made to the doctor for the purpose of being diagnosed as sex abuse victims. With respect to Jose Luis Lutin, the Government also contends that the statements are excluded from the hearsay bar under Fed.R.Evid. 803(4) because they were made for the purpose of "therapy" or treatment. Without explanation, the Government concedes that the 803(4) exception to the hearsay rule does not apply to the statements of Jose Luis Melendez, Rotilio Sanchez and Hugo Piedrasanta to the doctor. Presumably, this is because these three victims were merely "interviewed" by Dr. Miranda, and were neither "treated" nor "diagnosed."

## IV. DISCUSSION

### A. The Standards: Rules 703 and 803(4) of the Federal Rules of Evidence

Rule 803(4) of the Fed.R.Evid. excepts from the hearsay bar two types of statements: "[s]tatements made for purposes of *medical diagnosis* or *treatment* and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably perti-

nent to diagnosis or treatment." Fed. R.Evid. 803(4) (emphasis added). The Rule 803(4) exception to the hearsay rule for statements to a *treating* physician—as opposed to a *diagnosing* physician—rests on a theory of reliability flowing from the patient's understanding "that the effectiveness of the treatment received will depend upon the accuracy of the information provided to the physician." 2 McCormick on Evidence S 277, at 246–47 (John W. Strong ed., 4th ed.1992). The Supreme Court has noted that the patient's "selfish treatment" motive provides substantial guarantees of the trustworthiness of such statements. *White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 742, 116 L.Ed.2d 848 (1992).

The hearsay exception for statements made to physician for the purpose of treatment has a long history under common law. *See* McCormick on Evidence § 292 (E. Cleary 3d ed.1984). The Federal Rules of Evidence significantly changed the scope of the traditional rule by also permitting statements made to a doctor consulted only for the purpose of diagnosis, when no treatment is anticipated by the declarant, pursuant to Rule 803(4). Typically, such a statement involves one made to a doctor who is consulted with an eye toward litigation. The Advisory Committee Note states that " 'Conventional doctrine' excluded statements made to a physician solely for diagnostic purposes from the hearsay exception because they were not within its guarantee of truthfulness—'the patient's strong motivation to be truthful'." The rationale for the expansion of Rule 803(4) to include statements to a diagnosing physician is that even if the statements were excluded under the exception to the hearsay doctrine, the expert witness typically was permitted to relate the statements if they formed a basis of his opinion, a rule now embodied in Rule 703:

> The distinction thus called for was one most unlikely to be made by the juries. The rule accordingly rejects the limitation. This position is consistent with the provision of Rule 703 that the facts on which expert testimony is based need not be admissible in evidence if of a kind ordinarily relied upon by experts in the field.

Advisory Committee Note to Fed.R.Evid. 803(4); *see also* Robert P. Mosteller, *Child Sexual Abuse and Statements for the Purpose of Medical Diagnosis or Treatment,* 67 N.C.L.R. 257, 259–61 (1989).

There exist, therefore, two distinct rationales for the admissibility of statements to medical doctors: (1) the "selfish treatment" rationale, where the statement is made to a treating physician; and (2) the "basis of the expert's opinion" rationale, where the statement is made to a diagnosing physician.

## B. Admissibility of the Victim's Statements to a Doctor Identifying the Perpetrator

As set forth in the Advisory Committee Note to Rule 803(4), a declarant's statement identifying the person allegedly responsible for her injuries generally is inadmissible because such statements usually are not necessary to promote effective treatment, or to permit the expert to reach an appropriate diagnosis. Advisory Committee Note to Fed. R.Evid. 803(4). Thus, a patient's statement to his doctor that he was struck by an automobile would fall within the hearsay exception, but not his statement that the car was driven by Bob Smith through a red light. Advisory Committee Note to Fed.R.Evid. 803(4).

This is not, however, a hard and fast rule, especially in the context of child sex abuse allegations. The Fourth, Eighth, Ninth and Tenth Circuits have held that statements made by a victim of sexual abuse to a physician which identify the abuser as a member of the family or household may, under certain conditions, be "reasonably pertinent to diagnosis or treatment" and, hence, admissible. *See United States v. Joe,* 8 F.3d 1488, 1493–95 (10th Cir.1993), *cert. denied,* 510 U.S. 1184, 114 S.Ct. 1236, 127 L.Ed.2d 579 (1994); *United States v. Balfany,* 965 F.2d 575, 579 (8th Cir.1992); *United States v. George,* 960 F.2d 97, 99–100 (9th Cir.1992); *Morgan v. Foretich,* 846 F.2d 941, 949 (4th Cir.1988). Some courts which have confronted the issue have concluded that "[s]tatements revealing the identity of the child abuser are 'reasonably pertinent' to treatment because the physician must be attentive

to treating the child's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser." *United States v. Joe*, 8 F.3d at 1493–95; *United States v. Balfany*, 965 F.2d at 578. Where the abuser is a member of the family or household, and the victim is of a tender age, the abuser's identity may be especially pertinent to the physician's recommendation regarding an appropriate course of treatment, which may include removing the child from the home. *United States v. Joe*, 8 F.3d at 1493–95.

## C. The Court's Exclusion of Dr. Miranda's Expert's Opinion at Trial

■ The Court begins by observing that it struck Dr. Miranda's trial testimony regarding his expert opinion that the six victims he interviewed were telling the truth about being sexually abused by Wetterer. By the same token, the "doctor's diagnosis of sexual abuse [is] 'only a thinly veiled way of stating that [the victims] w[ere] telling the truth.'" *Westcott v. Crinklaw*, 68 F.3d 1073 (8th Cir. 1995) (quoting *United States v. Whitted*, 11 F.3d 782, 787 [8th Cir.1993]). Thus, that "diagnosis" is struck as well. As noted in *Mathie v. Fries*, 935 F.Supp. 1284, 1295–96 (E.D.N.Y.1996), *modified on other grounds*, 121 F.3d 808 (2d Cir.1997), this Court is reluctant to give credence to the testimony of an expert as to the credibility of a witness, in this case the alleged victims of sexual abuse. The Second Circuit has held that:

> An expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony. The credibility of witnesses is exclusively for the determination by the [fact-finder], *United States v. Richter*, 826 F.2d 206, 208 (2d Cir.1987), and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial. . . . Moreover, even expert witnesses possessed of medical knowledge and skills that relate directly to credibility may not state an opinion as to whether another witness is credible, *United States v. Azure*, 801 F.2d 336, 340–41 (8th Cir.1986), although such witnesses may be permitted to testify to relevant physical or mental conditions. *See gener-*

*ally* Annotation, Necessity and Admissibility of Expert Testimony as to Credibility of Witnesses, 20 A.L.R.3d 684 (1968).

*United States v. Scop*, 846 F.2d 135, 142 (2d Cir.), *rev'd in part on reh'g on other grounds*, 856 F.2d 5 (2d Cir.1988).

The New York State Court of Appeals' seminal decision in the related field of rape trauma, *People v. Bennett*, 79 N.Y.2d 464, 583 N.Y.S.2d 825, 593 N.E.2d 279 (1992), is instructive. In *Bennett*, the Court concluded that evidence of "rape-trauma syndrome" as to ordinary responses of rape victims is admissible, since it is generally accepted in the relevant scientific community. *See People v. Taylor*, 75 N.Y.2d 277, 552 N.Y.S.2d 883, 552 N.E.2d 131 (1990). However, such evidence is inadmissible "when introduced merely to prove that a sexual assault took place . . . or to bolster a witness' credibility. . . . In such instances, the potential value of the evidence is outweighed by undue prejudice to the defendants or interference with the province of the jury." *Bennett*, 79 N.Y.2d at 473, 583 N.Y.S.2d at 831, 593 N.E.2d at 285. The Court also notes that the decision whether to admit expert testimony under Fed.R.Evid. 702 is vested in the broad discretion of the trial court. *United States v. Ruggiero*, 928 F.2d 1289, 1304 (2d Cir.), *cert. denied*, 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991).

Dr. Miranda testified extensively about his conclusions that those he interviewed and/or evaluated had been sexually abused by Wetterer at Mi Casa. Although the Federal Rules of Evidence do not bar all expert testimony concerning an ultimate issue, *see* Fed.R.Evid. 704, a district court may exclude ultimate issue testimony under Federal Rule of Evidence 702 when it is not helpful to the trier of the facts or under Rule 403 when it may be unduly prejudicial. *See United States v. Schatzle*, 901 F.2d 252, 257 (2d Cir.1990); *United States v. Brown*, 776 F.2d 397, 401 n. 6 (2d Cir.1985), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986). In this case, the Court is capable of assessing the credibility of the key witnesses on its own and finds that Dr. Miranda's testimony on the issues of whether the sexual

abuse occurred, and whether Wetterer was the perpetrator, are unduly prejudicial and will be ignored by the Court. *See United States v. Serna*, 799 F.2d 842, 850 (2d Cir. 1986), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987) (No error to exclude expert testimony on the lack of reliability of eyewitnesses); *cf. Arcoren v. U.S.*, 929 F.2d 1235, 1240 (8th Cir.) (In unusual circumstances district court did not abuse discretion in admitting expert testimony regarding battered woman syndrome), *cert. denied*, 502 U.S. 913, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991).

**D. Analysis**

The central issue before the Court is this: where a psychologist is consulted solely for the purpose of diagnosis, and the Court rules that the diagnosis is inadmissible, do the declarants' statements to the psychologist for the purposes of diagnosis fall within the hearsay exception of Rule 803(4)? By the same token, can those statements come in under the Rule 703 "basis-of-the-expert-opinion" rationale if the expert witness's opinion is inadmissible?

In discussing this very problem, one commentator observed:

> Under the rationale that statements are admissible [under Rule 803(4) ] because they form the basis of the expert's opinion, the only explicit justification for the hearsay exception, albeit a limited, largely negative one, is that the statements would be heard by the jury in any event since they would be admitted for the limited purpose of showing the basis of the expert's opinion [pursuant to Rule 703]. Logically, then, a prerequisite to admission of the statement should be that the expert testify in the case, giving a relevant, admissible opinion as to which the statement provides a basis.

Mosteller, *supra*, 67 N.C.L.R. at 267. Thus, the rationale underlying Rules 703 and 803(4) suggests that statements to a diagnosing physician should be admitted only if the doctor offers an admissible opinion or diagnosis at trial. See 4 Christopher B. Mueller and Laird C. Kirkpatrick; *Modern Evidence, Doctrine and Practice*, § 8.41, p. 1262 (2d ed.1994).

i. *The Statements of Rotilio Sanchez, Hugo Piedrasanta and Jose Luis Melendez*

■ The Government contends that the accusations of sex abuse by three of the victims—Rotilio Sanchez, Hugo Piedrasanta, and Jose Luis Melendez—to Dr. Miranda should be admitted pursuant to Rule 703 because they formed the basis for the doctor's "opinion" that Wetterer was sexually abusing them and other boys at Mi Casa. The problem is that the doctor's "opinion" has been deemed inadmissible and been stricken from the record. Logically, then, the entire basis for the statements' admission is absent. The Court concludes, therefore, that the statements of Rotilio Sanchez, Hugo Piedrasanta, and Jose Luis Melendez are inadmissible hearsay and must be stricken from the record.

Even assuming that Dr. Miranda's expert opinion was admissible, the Court has grave doubts whether the statements of these three individuals could form the basis for such an opinion. Notably, the Government does not proffer 803(4) as a basis for the admission of these statements, impliedly conceding that they were not spoken for the purpose of treatment or diagnosis. Relatedly, the Government admits that these individuals were never "evaluated" by the doctor, but were, instead, merely cursorily questioned. In the case of Hugo Piedrasanta, Doctor Miranda candidly conceded that their most meaningful encounter took place during an after-dinner chat on a Guatemalan street, and did not even rise to the level of an "interview." It is difficult to comprehend how such superficial encounters could form the basis of an expert opinion on so weighty a matter.

Moreover, as for the unrecorded "interviews" of Jose Luis Melendez and Rotilio Sanchez, the doctor provided only the most bare-bones testimony to the effect that they were "victims" who "alleged molestation," and who "gave in my opinion reliable statements.". The Government elicited no testimony whatsoever regarding the length and complexity of the interviews; when the interviews occurred; where the interviews occurred; who else—if anyone—was present

during the interviews; when, where, or how the abuse reportedly occurred, or; how old the victims were at the time of the alleged abuse or the interview (Miranda: Tr. 695, 704, 1253). None of these individuals were produced at trial and subjected to cross-examination. In the Court's opinion, Dr. Miranda's boiler-plate testimony stretches Rule 703 beyond its breaking point. Accordingly, it is hereby ordered that the statements of Rotilio Sanchez, Hugo Piedrasanta, and Jose Luis Melendez constitute inadmissible hearsay. They are stricken from the record in their entirety. They will not be considered by this Court.

Since Hugo Piedrasanta's declarations of sexual abuse to Dr. Miranda are stricken in their entirety, the Court also strikes the related testimony of Dr. Miranda that he "heard" about Hugo later recanting, and that, in his training and experience, there are numerous reasons why a "bona fide" victim of sexual abuse would recant (Miranda: Tr. 702–04, 1271–72).

ii. *The Statements of Leonel Piedrasanta, Jose Luis Lutin and Manuel Bravo*

■ Doctor Miranda's testimony regarding the statements of Leonel Piedrasanta, Manuel Bravo and Jose Luis Lutin suffer from similar deficiencies. With respect to these three victims' statements to Dr. Miranda, the Government offers them as an exception to the hearsay bar pursuant Rule 803(4), as well as under Rule 703. However, how can statements made for the "purpose of diagnosis" be admitted when the "diagnosis" itself is not? How can statements form the basis for an expert "opinion" that is not in evidence? The Government would have this Court allow Dr. Miranda to act as a "conduit for hearsay." Mueller and Kirkpatrick, "Modern Evidence, Doctrine and Practice" § 8.41, at 1262. Such a result cannot be permitted.

The Court has reviewed the cases relied on by the Government, and finds them to be inapposite. The Government relies, in large measure, on cases standing for the proposition that statements made by a victim of sexual abuse to a physician which identify the abuser as a member of the family or household are "reasonably pertinent to diagnosis or treatment" and may, therefore, be admissible under Rule 803(4). *See, e.g., United States v. Joe,* 8 F.3d at 1493–95; *United States v. Balfany,* 965 F.2d at 579 (citing *Renville,* 779 F.2d at 436); *United States v. George,* 960 F.2d at 99–100; *Morgan v. Foretich,* 846 F.2d at 949. Once again, the Government fails to clear the basic hurdle: in this case, Dr. Miranda's "diagnosis" was not admitted into evidence.

■ The Court agrees that where the abuser is a member of the family or household, the child-victim's statements to a physician regarding the sexual abuse and identity of the perpetrator may be admissible under 803(4) if pertinent to the physician's recommended treatment, such as the youth's removal from the home. *See, e.g., United States v. Joe,* 8 F.3d at 1493–95. Here, the Government did not lay the proper foundation for admission under this theory. No testimony was elicited to establish that any of the victims interviewed by Dr. Miranda were, at the time of the evaluation or interview, residing with Wetterer at Mi Casa. Dr. Miranda never testified that the identity of the abuser was pertinent to his "diagnosis" or "treatment" of the interviewees. Moreover, the Government did not establish that any of the victims were children at the time of Dr. Miranda's interviews and evaluations: the Government offered no evidence of the ages of Rotilio Sanchez, Jose Luis Melendez, and Hugo Piedrasanta when they were interviewed by Dr. Miranda; and Dr. Miranda testified that when he evaluated Leonel Piedrasanta, Manuel Bravo and Jose Luis Lutin, they were not "children" (Miranda: Tr. 1094). Accordingly, the justification provided in the cases cited is not present here.

While not dispositive, the Court also is troubled that a New York Newsday reporter, Richard Firstman, attended the March 1989 interview of Leonel Piedrasanta, and actually *conducted* the "evaluation" of Manuel Bravo (Miranda: Tr. 685–86, 1140–42, 1167–68, 1219, 1222). Indeed, the doctor was at a loss to explain his own presence during the meeting with Bravo, thereby evidencing that the psychological "evaluation" was merely ancillary to the journalist's agenda. By the doc-

tor's own admission, it is "not common practice" for a reporter to attend a psychological evaluation session, let alone lead the questioning. In fact, Dr. Miranda testified, the questioning of sex abuse victims requires extensive training, and must be conducted with the utmost discretion to avoid suggesting desired answers to a vulnerable patient. To have permitted a journalist to, in one instance, attend this delicate process, and in another instance, steer the questioning, is disturbing.

■ With respect to Jose Luis Lutin, the Court rejects the Government's contention that the statements are exempted from the hearsay bar under Fed.R.Evid. 803(4) because they were made for the purpose of "therapy" or treatment. Dr. Miranda testified that Jose Luis Lutin was the only abuse victim he interviewed whom he provided with "therapy" (Miranda: Tr. 1096). However, the Government elicited no testimony regarding: (1) what Dr. Miranda meant by "therapy"; (2) what the subject of the "therapy" was—i.e. whether it was for sexual abuse, or a wholly unrelated matter; or (3) whether the "therapy" was provided during the September 1990 evaluation session, when Lutin told the doctor about the sexual abuse by Wetterer, or during the "two or three" other occasions when the doctor and Lutin met (Lutin: Tr. 1056). Therefore, the Court finds that the Government failed to establish that the statements were made for the purpose of treatment.

Accordingly, Doctor Miranda's testimony regarding the statements of Leonel Piedrasanta, Manuel Bravo and Jose Luis Lutin are stricken from the record, as is the transcript and tape-recording of Dr. Miranda's interviews of Leonel Piedrasanta. In view of the Court's ruling, it is unnecessary to address the defendants' alternative arguments that the statements should be excluded because Dr. Miranda is a biased and inaccurate witness, and because the defense was deprived of the opportunity to cross-examine Jose Luis Melendez, Rotilio Sanchez, Hugo Piedrasanta and Leonel Piedrasanta.

### E. The Motion to Strike Testimony Regarding Delayed Reporting of Sexual Abuse

■ Finally, the defendants move to strike the expert testimony of Dr. Miranda and Agent Lanning regarding reasons why victims often delay, or altogether avoid, reporting sexual abuse (Miranda: Tr. 682–84; Lanning: Tr. 1325). The male victims in this case waited many years before coming forward to reveal that Wetterer had sexually abused them in the Mi Casa orphanage. The Court concludes that under the circumstances present in this case, expert testimony explaining that young boys are particularly reluctant to reveal the abuse because they fear being stigmatized or condemned by society, fear the abuser, and may like and depend on the abuser, was relevant to explain why the victims initially may have been unwilling to report that Wetterer molested them. "Behavior of this type is not within the ordinary understanding of the [fact-finder] and testimony explaining this behavior assists the [Court] in determining what effect to give the [victims'] initial failure to [report the abuse].... This evidence provides a possible explanation for the [victims'] behavior that is consistent with [their] claims that [they were molested]. As such, it is relevant." *Taylor*, 75 N.Y.2d at 292, 552 N.E.2d at 138, 552 N.Y.S.2d at 890. The Court notes that such testimony is not being admitted for the purpose of proving that the sexual abuse occurred.

### V. CONCLUSION

Having reviewed the parties' submissions and heard oral argument, and for the reasons set forth above, it is hereby

ORDERED, that the defendants' motion to strike Doctor Miranda's testimony regarding recantation, and the statements of Leonel Piedrasanta, Manuel Bravo, Rotilio Sanchez, Hugo Piedrasanta, Jose Luis Melendez and Jose Luis Lutin is granted; and it is further

ORDERED, that the defendants' motion to strike the transcript and tape-recording of Dr. Miranda's interviews of Leonel Piedrasanta is granted; and it is further

ORDERED, that the defendants' motion to strike the expert testimony of Dr. Miranda and Agent Lanning regarding reasons why victims often delay, or altogether avoid, reporting sexual abuse, is denied.

SO ORDERED.