Frankie **SPENCER,** Appellant,

v.

**UNITED STATES,** Appellee.

Nos. 92–CF–1474, 94–CO–1337.

District of Columbia Court of Appeals.

Argued April 18, 1996.
Decided Jan. 23, 1997.

---

Claire T. Roth, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Gary H. Collins, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Jennifer M. Anderson, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, STEADMAN, and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellant Spencer and a co-defendant, Bernard Bishop, were convicted of distributing cocaine, in violation of D.C.Code § 33–541(a)(1) (1993). Spencer noted an appeal from his conviction.[1] While that appeal was pending, he filed a motion to vacate his sentence under D.C.Code § 23–110 (1996). The trial court denied the motion, and Spencer noted a second appeal, which we consolidated with the first. Before this court Spencer makes three arguments. First, he contends that the evidence was insufficient to support his conviction; second, he maintains that the trial court abused its discretion by limiting defense counsel's cross-examination of the government's expert witness; third, he argues that the court erred in denying his § 23–110 motion without a hearing. We reject the first and third arguments; as to the second, we agree that the court committed error but find the error harmless. We there-

---

1. Bishop also appealed from his conviction, but for some reason, contrary to our usual practice, the two appeals were not consolidated. Bishop's appeal was briefed and argued separately, and in due course his conviction was affirmed by this court in an unpublished memorandum opinion and judgment. *Bishop v. United States,* No. 92–CF–850 (D.C. August 3, 1993).

fore affirm both the conviction and the denial of the § 23–110 motion.

I

On December 27, 1991, at about 5:30 p.m., Officer Cornell Johnson of the Metropolitan Police was on duty in plain clothes, working under cover. From the top of a hill on Sayles Place, S.E., overlooking the 2500 block of Sheridan Road, Officer Johnson saw two men, later identified as Spencer and Bishop, standing together and conversing with each other about twenty feet downhill from where he was standing. No one else was near them. Johnson called down to Spencer and Bishop, "Do you have any dimes?" [2] When Spencer said yes, Johnson walked down Sayles Place to Sheridan Road and asked Spencer if he could buy a dime. Spencer asked how many he wanted, and Johnson said he wanted one, to which Bishop replied, "Yeah."

Bishop then walked about five feet away from Johnson and Spencer, reached down into a grassy area, "and retrieved a large plastic bag with numerous ziplocks." Returning to where Johnson and Spencer were waiting, Bishop handed Johnson a ziplock bag containing a rock-like substance, and in exchange Johnson gave Bishop two $5 bills whose serial numbers had been pre-recorded. After the purchase, Spencer said to Bishop, in Johnson's presence, that Officer Johnson was "the police" and that they had met before. Bishop responded that Officer Johnson "wasn't the one," meaning that he was not a police officer.

After the transaction was completed, Officer Johnson walked back along Sheridan Road to meet with his sergeant, Tammy Mitchell. Johnson gave Sergeant Mitchell a description of both men, which she broadcast over the radio to a nearby arrest team. About a minute later, Officers Suber and Myers, both members of the arrest team, saw Bishop standing at a pay phone on the corner of Sheridan Road and Bowen Road. Realizing that Bishop matched the description he had just heard over the radio, Myers approached him and identified himself as a

police officer. Bishop started to run, but Officer Suber grabbed him. Moments later, after Officer Johnson identified Bishop while riding by in an automobile, Bishop was formally placed under arrest. Officer Suber searched him and found in his possession a pager and $427 in currency, including the pre-recorded $5 bills.

Meanwhile, after the initial lookout had been broadcast, Officer Johnson walked back up to Sayles Place, where he saw Spencer crossing the street. Johnson immediately radioed Spencer's location to the arrest team, and within a minute or two Spencer was detained at the top of the hill on Sayles Place. A few minutes later, Officer Johnson field-tested the substance he had purchased from the two men, then placed it into a heat-sealed envelope. Later analysis by a chemist confirmed that the substance was cocaine.

The government also presented the expert testimony of Detective Joseph Brenner, who described the usual methods of distribution of crack cocaine and the procedures used by the police in handling narcotics evidence. Detective Brenner spent considerable time explaining the roles of "runners" and "holders" during a sale of drugs on the street, noting that it was common practice for drug dealers to act in concert, with one person (the runner) acting as an intermediary between the buyer and the seller, "mak[ing] arrangements for the sale of the drugs," while the actual seller (the holder) held the money, the drugs, or both. The runner, he explained, could be compared to a waiter or waitress in a restaurant, who takes the customer's order and then gives it to another person in the kitchen, who actually prepares the food and puts it on the plate. Brenner also said, in response to a question from the prosecutor, that it was not unusual for runners and holders to stand near each other while conducting their drug-selling business; in that instance, he observed, "the holder hears what the customer wants."

Spencer offered no evidence in his own behalf. Bishop presented an alibi defense and also sought to establish, through the testimony of his girl friend, that he had a legitimate use for the pager.

---

**2.** Officer Johnson explained that the term "dime" refers to $10 worth of crack cocaine.

## II

Spencer contends that the evidence was insufficient to support his conviction of aiding and abetting Bishop's distribution of cocaine. The evidence, according to Spencer, did not show that he was a runner for Bishop or that he screened prospective customers. Instead, he says, it "tended to prove that Spencer spoke with [Officer] Johnson to sell his own drugs but refrained from completing the deal when he recognized Johnson as an undercover police officer."

In considering a challenge to the sufficiency of the evidence, we must view the evidence in the light most favorable to the government, "giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Byrd v. United States*, 388 A.2d 1225, 1229 (D.C.1978) (citations omitted); *accord, e.g., Curry v. United States*, 520 A.2d 255, 263 (D.C.1987). We recognize no distinction between direct and circumstantial evidence. *Franey v. United States*, 382 A.2d 1019, 1023 (D.C.1978) (citing cases); *see Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137–138, 99 L.Ed. 150 (1954). The government is not required to negate every reasonable hypothesis of innocence. *Irick v. United States*, 565 A.2d 26, 30 (D.C.1989) (citing cases). Assessed in light of these long-established standards of review, appellant's sufficiency argument is without merit.

■ To convict Spencer as an aider and abettor, the government had to prove that the cocaine was distributed by someone (in this instance Bishop), that Spencer in some way assisted, facilitated, or participated in the distribution, and that he did so with guilty knowledge. *See, e.g., Blakeney v. United States*, 653 A.2d 365, 370 (D.C.1995); *Lowman v. United States*, 632 A.2d 88, 93 (D.C.1993). There is no dispute that Bishop sold cocaine to Officer Johnson and that Spencer was present during the sale. Spencer contends, however, that he did not assist Bishop, and that there was no evidence to show that he and Bishop were working together or involved in a joint venture. Without such a showing of concerted activity, Spencer maintains that the government's expert testimony "could not satisfy a juror

beyond a reasonable doubt that [he] was screening customers for Bishop."

■ While it is true that "mere presence at the scene of the crime is insufficient to establish criminal participation, 'proof of presence at the scene of a crime plus conduct which designedly encourages or facilitates a crime will support an inference of guilty participation as an aider and abettor.' " *Griggs v. United States*, 611 A.2d 526, 528 (D.C. 1992) (citations omitted). We are satisfied that the evidence was sufficient to prove that Spencer's conduct amounted to more than mere presence, and that his actions encouraged and facilitated Bishop's sale of cocaine to Officer Johnson.

Officer Johnson testified that Spencer and Bishop were standing alone, conversing with each other, when he called to Spencer, "Do you have any dimes?" After Spencer said yes, Johnson approached them, repeated his question, and was asked by Spencer, "What do you want?" Johnson said he wanted one, and *Bishop* responded, "Yeah," a fact which strongly suggests that the two were acting in concert. Bishop then walked a short distance, reached into a grassy area, retrieved the cocaine, and sold it to Officer Johnson. After the sale, Spencer said to Bishop, in Johnson's presence, that he recognized Johnson as a police officer because the two of them had met before. Bishop replied that Johnson was not the police.

Officer Johnson's testimony thus demonstrated not just an association between Bishop and Spencer, but a joint involvement in the sale of cocaine; the jury could, at least, infer such an involvement. Spencer's complicity was further established by the expert testimony of Detective Brenner. "From his testimony the jury could readily and reasonably infer that appellant was the runner in this particular drug-selling operation." *Thompson v. United States*, 678 A.2d 24, 28 (D.C.1996); *see Lowman, supra*, 632 A.2d at 89–90; *Griggs, supra*, 611 A.2d at 528; *Stevenson v. United States*, 608 A.2d 732, 733 (D.C.1992); *Green v. United States*, 608 A.2d 156, 158 (D.C.1992). Spencer now offers a different interpretation of the conversation among Johnson, Bishop, and himself, namely,

that he and Bishop were independent drug dealers seeking to serve the same customer. The government, however, was "not required to rebut all possible inferences of innocence," *Lowman,* 632 A.2d at 90, and the jury in any event never heard this alternative interpretation because Spencer presented no evidence. We hold, therefore, that a jury could reasonably find Spencer guilty of distributing cocaine on a theory of aiding and abetting.

### III

■ Spencer's second contention, that the trial court abused its discretion in cutting off defense counsel's cross-examination of Detective Brenner, is more troubling. He argues that the trial judge committed reversible error when he prohibited defense counsel from asking Detective Brenner on cross-examination whether it might be possible that someone other than a runner could be standing next to a drug dealer. By restricting this line of questioning, Spencer claims (1) that "the judge arbitrarily barred [defense counsel] from asking the expert whether the facts upon which his opinion was based were consistent with innocence after the judge permitted the government to ask whether the same facts were consistent with guilt," and (2) that "the judge abused his discretion by failing to permit reasonable cross-examination designed to challenge the strength of the expert's opinion."[3] The government maintains, on the other hand, that the trial judge properly limited the cross-examination, since the question posed by defense counsel was "designed to elicit expert testimony regarding a matter of common knowledge." Whereas the questions posed by the prosecutor on direct examination dealt with an issue "beyond the ken of the average lay person," *i.e.,* the *modus operandi* of drug traffickers, the government asserts that defense counsel's question "bore directly on a matter of common sense" that the jury could consider without expert help. While we agree with the government that drug trafficking in general is a subject best suited for an expert to describe, we do not accept the notion that an expert may never be cross-examined with lay questions. We are particularly reluctant to do so in a case such as this, in which the expert is being asked to comment on a "matter of common sense" in light of his expertise, *i.e.,* to state whether, given the *modus operandi* of the drug world, the immediate presence of someone other than a runner or other active participant would be an expected event.

During the prosecutor's direct examination of Detective Brenner, the following exchange took place:

Q.... [W]hat is a runner?

A. A runner in a drug operation where there's more than one person involved is the person that the customer has contact with in some conversation as to what the customer is looking for. And what the runner does is make arrangements for the sale of the drugs.

Now, one of the ways it can be done is that the runner could bring the customer to the person that has the drugs, who is known as the holder. Bring the holder to the customer or notify the holder of a sale and the holder would bring—would get the drugs usually from a stash and bring it back to the customer, or in some cases the runner may collect the money from the customer, go to the holder, get the drugs that is requested by the customer, and bring it back to the customer.

Q. Is it possible to have the runner and the holder in the same place?

A. Yes.

Q. And what function would the runner at that point serve?

A. Well, the runner is—think of it as when you go to a restaurant and you're waited on by a waiter or a waitress, they take your order and give the order to someone else who prepares the food that you're to have. The waiter or the waitress

---

**3.** According to Spencer's brief, the expert's testimony on direct examination suggested that a person could be part of an ongoing drug operation simply by telling the drug dealer that a prospective customer was "okay." "Given the broad reach of Detective Brenner's net of complicity," he maintains, "defense counsel should have been permitted to probe how little conduct Detective Brenner needed to conclude that someone was 'screening' customers."

doesn't go back and make it, they just take your order.

So it's the same type of situation where the runner is the one that has the conversation with the customer to find out what it is that the customer wants and then the holder would get that.

If the holder is with the runner at the time, the holder hears what the customer wants.

On cross-examination, defense counsel first asked the witness to explain again the role played by a runner during a drug transaction. The following then occurred:

Q.... Now, if an individual would be standing next to a person who's selling drugs has done nothing more than that, that person wouldn't be a runner, would he?

THE COURT: Just a moment. Just a moment, Mr. Douglas.

During the ensuing bench conference, the court explained:

THE COURT: Generally speaking, counsel, I don't allow either the Government or defense counsel to propose hypotheticals based on what the defendants actually did. Especially in criminal cases, unless there's some compelling reason I need to do that, because all it gets into is each counsel practicing up their closing argument on the witness to ask his opinion.

Is there some compelling reason, Mr. Douglas, that I should permit that type of question?

MR. DOUGLAS: Well, Your Honor, I think that—well, my position is that he's an expert and he can testify to drug transactions. Now, there are instances where an individual can be standing next to a drug dealer and not be involved in it, and I just want to elicit testimony from him to that effect. I think that I have a right to be able to state that if someone is—that it's

not a crime to stand next to someone who's dealing drugs.

THE COURT: You have the right to argue that to the jury, but I'm—I don't want too much mischief to occur, to allow you to start proposing those type of hypotheticals to this witness. I realize that the practice is different in different courtrooms.

MR. DOUGLAS: Uh-huh.

THE COURT: But no, don't proceed with this. Let me be clear that what you're proposing is an argument you can still make in final argument.

MR. DOUGLAS: Very well, Your Honor.

THE COURT: It's not an issue you need to propose to an expert witness.

It is well established that a trial judge has broad discretion to admit or exclude expert testimony, and that a decision either way should be affirmed unless it is manifestly erroneous. *See Blakeney, supra,* 653 A.2d at 369; *Griggs, supra,* 611 A.2d at 527. "Expert opinion evidence should generally be admitted if it will assist the jury to understand the facts in issue." *Coates v. United States,* 558 A.2d 1148, 1152 (D.C.1989). Thus this court has "frequently upheld the use of expert testimony to aid the jury's understanding of drug trafficking in the District." *Griggs,* 611 A.2d at 527 (citations omitted); *accord, e.g., Blakeney, supra,* 653 A.2d at 369; *Hinnant v. United States,* 520 A.2d 292, 293–294 (D.C.1987); *Harris v. United States,* 489 A.2d 464, 470–471 (D.C.1985).[4] Moreover, "[i]t is generally acknowledged that experienced police officers can be helpful in explaining to ordinary citizens the *modus operandi* of persons who commit crimes, and on that basis they have frequently been allowed to testify as expert witnesses." *Ford v. United States,* 533 A.2d 617, 626 (D.C. 1987) (en banc) (citations omitted). We see nothing in this case that warrants departure from these well-settled principles.

---

**4.** *See also United States v. Clarke,* 306 U.S.App. D.C. 251, 262–263, 24 F.3d 257, 268–269 (1994); *United States v. Mitchell,* 302 U.S.App. D.C. 153, 157, 996 F.2d 419, 423 (1993); *United States v. Chin,* 299 U.S.App. D.C. 73, 76–77, 981 F.2d 1275, 1278–1279 (1992), *cert. denied,* 508 U.S. 923, 113 S.Ct. 2377, 124 L.Ed.2d 281 (1993); *United States v. Williams,* 299 U.S.App. D.C. 20, 23, 980 F.2d 1463, 1466 (1992); *United States v. Boney,* 298 U.S.App. D.C. 149, 153–154, 977 F.2d 624, 628–629 (1992); *United States v. Lancaster,* 296 U.S.App. D.C. 379, 384, 968 F.2d 1250, 1255 (1992); *United States v. Doe,* 284 U.S.App. D.C. 199, 202, 903 F.2d 16, 19 (1990); *United States v. Dunn,* 269 U.S.App. D.C. 373, 375, 846 F.2d 761, 763 (1988).

Spencer contends that the hypothetical questions that the prosecutor posed to the expert, because they closely mirrored the facts in this case, allowed the expert as a practical matter to state his opinion that Bishop and Spencer were playing those roles in this particular drug sale. Although some courts have expressed discomfort over this type of questioning because it arguably preempts the function of the jury,[5] such questions and answers have generally been allowed, provided that the expert does not express a direct opinion on the defendant's guilt. *See United States v. Boney, supra* note 4, 298 U.S.App. D.C. at 154, 977 F.2d at 629 ("by stating that the defendants' actions fit the pattern of a typical drug sale, [the expert] did not draw a conclusion so obvious that it could be thought he invaded the jurors' province"). Because he did not direct his testimony to this specific case, Detective Brenner's answers to the prosecutor's questions were general *modus operandi* evidence; that is, they concerned a hypothetical typical drug seller, not Spencer in particular. *See, e.g., United States v. Williams, supra* note 4, 299 U.S.App. D.C. at 23, 980 F.2d at 1466; *United States v. Boney, supra* note 4, 298 U.S.App. D.C. at 154, 977 F.2d at 629 (expert's testimony "was similar to a statement that a defendant's actions mirrored a common criminal *modus operandi*—a form of testimony generally allowed" (citations omitted)). If the expert "goes beyond a description of criminal *modus operandi* in general and assigns specific roles to individual defendants," it is within the trial court's discretion to exclude such testimony if it is "unfairly prejudicial." *Id.* at 156, 977 F.2d at 631. Apparently the trial judge in this case did not view Detective Brenner's testimony as "unfairly prejudicial," and we have no reason to conclude that his assessment was unreasonable.

Having said this, however, we must consider whether the trial judge, by preventing defense counsel from asking the "flip side" of the government's hypothetical, applied an impermissible double standard. The government argues that although the subject matter of Brenner's testimony, drug trafficking, was beyond the ken of the average lay person, the individual questions challenging his opinion were not, and that the judge therefore acted properly in restricting defense counsel's cross-examination. We find this argument illogical and unpersuasive. As Spencer aptly states in his reply brief:

> It defies common sense that after a trial judge has found that the subject matter of the expert testimony is admissible, and that the expert is qualified to give it, individual questions relevant to the "subject matter" of the expert testimony are subject to the same analysis. [The government's] argument would lead to absurd results. For example, an arson expert describing the causes of fire could never testify that wood burns, because it is a matter of common knowledge that wood burns. A medical expert testifying how a bullet passed through the decedent's heart could not demonstrate for the jury the location of the heart, because the testimony is not "beyond the ken of the average lay person."

The government cites no case, and we have found none, standing for the proposition that even though a particular subject matter may be appropriate for expert testimony, specific questions can be barred if they are based on common knowledge. On the contrary, an expert witness' answers to such questions can be illuminating when considered in the context of the witness' expertise.

What our case law does establish is that a defendant is entitled to conduct a probing cross-examination of an expert witness who testifies for the government. *E.g., Clifford v. United States,* 532 A.2d 628, 633–634 (D.C. 1987) ("The need to permit a criminal defendant the means to expose the basis of expert evidence against him is particularly strong" (citations omitted)); *accord, e.g., United States v. Williams,* 447 F.2d 1285, 1290 (5th Cir.1971) (en banc) (defendant's Confrontation Clause rights are infringed when court does not permit cross-examination about basis of expert's opinion), *cert. denied,* 405 U.S.

---

**5.** *See, e.g., United States v. Boissoneault,* 926 F.2d 230, 233 (2d Cir.1991); *United States v. Cruz,*

797 F.2d 90, 96 (2d Cir.1986).

954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972). We have also held, and now reiterate, that "the knowledge of trained investigators that drug sales are often conducted in teams [is] not without limitations." *Haywood v. United States,* 584 A.2d 552, 555 (D.C.1990) (citation omitted). These limitations are what a court should allow the defense to discover and explore on cross-examination. This is not to say that cross-examination may be used as an opportunity for the defendant to present his own case, for it is beyond doubt that such a strategy, if attempted, would be improper, and a trial judge could permissibly nip it in the bud. *See Letsinger v. United States,* 402 A.2d 411, 415 (D.C.1979). But the question that defense counsel sought to ask here, whether an individual could stand next to a holder and not be a runner, merely tested the assumptions which formed the basis for Detective Brenner's opinion, as well as the conclusions to be drawn from his testimony. *See In re Melton,* 597 A.2d 892, 903 (D.C. 1991) (en banc). It should have been allowed.

As we said earlier, Detective Brenner's testimony on direct examination was properly before the jury. It would be contrary to common sense, therefore, for us to accept the government's argument that defense counsel's hypothetical question on cross-examination, though similarly patterned after the facts already known to the jury, was inappropriate. Thus we conclude that the trial judge abused his discretion when he disallowed counsel's question, all the more so by purporting to enforce a uniform rule.[6] Having permitted the prosecutor to ask the expert whether certain facts were consistent with guilt, he could not then refuse to allow defense counsel to ask whether the same facts were consistent with innocence.

The government argues nevertheless that if the trial judge erred, the error was harmless. On balance, we are inclined to agree. We note that the judge told defense counsel that he could argue in his summation the inference implicit in his disallowed question, and counsel did so. Moreover, although

Spencer presented no evidence, it is apparent from the record as a whole that he relied on a defense of misidentification. The evidence identifying him as the aider and abettor, however, was strong. Officer Johnson testified that he was only an arm's length away from Spencer and Bishop, and that throughout the drug sale, which lasted about four or five minutes, he focused his attention on "the face and the clothing" of both men because he knew that he would later be called upon to identify them. Equally significant is the fact that Spencer was arrested within minutes after the transaction, approximately a block away from the site of the sale, wearing the same clothes described in the broadcast lookout. Johnson positively identified him at that time. Finally, although the expert's view would not have been irrelevant, the jurors in all likelihood would know as a matter of common sense, without the benefit of any expert testimony, that simply standing near a drug seller does not necessarily make someone a participant in the sale—which was the very point that counsel, through his questioning, sought to make.

If defense counsel's proposed questions had been more central to the case, the result of this appeal might be different. On the record before us, however, we are satisfied that any prejudice flowing from the court's refusal to allow the disputed line of questioning was harmless. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) (error is deemed harmless if this court can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error").

### IV

In his § 23–110 motion, Spencer asserted that his trial attorney had been ineffective in various respects. The trial court denied the motion without a hearing in an eight-page order, concluding that Spencer had not made the two-part showing required by *Strickland*

---

**6.** *Cf. Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979) ("when the trial court recognizes its right to exercise discretion but declines to do so, preferring instead to adhere to a uniform policy, it also errs").

*v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

*Strickland* holds that a defendant claiming ineffective assistance of counsel must show, first, that counsel's performance was deficient, and second, that this deficiency prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064. To establish prejudice, the defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068; *see Smith v. United States,* 608 A.2d 129, 131 n. 4 (D.C.1992) (movant must show "that but for trial counsel's error there is a reasonable probability that the defendant would have been found not guilty"). Spencer's motion does not pass the *Strickland* test.

▌ Along with its opposition to Spencer's motion, the government submitted an affidavit from his trial counsel refuting the allegations made in the motion. Spencer contends that the trial court erroneously relied on that affidavit "to resolve the factual dispute between appellant and counsel." This argument might have some merit if Spencer had submitted an affidavit of his own—but he did not. The court therefore committed no error by looking to counsel's unrebutted affidavit in ruling on the § 23–110 motion. *See Ready v. United States,* 620 A.2d 233, 235 (D.C. 1993) (absence of "affidavit or other credible proffer ... persuades us that the trial court did not err in declining to hold a hearing" on § 23–110 motion); *Sykes v. United States,* 585 A.2d 1335, 1338–1339 (D.C.1991) (absence of affidavit "is significant").

We agree with the trial court that Spencer's motion was "vague and conclusory" and therefore was properly denied without a hearing. *Pettaway v. United States,* 390 A.2d 981, 984 (D.C.1978). The motion failed to allege, as the case law requires, facts that would support the claim of ineffectiveness. *See, e.g., Ellerbe v. United States,* 545 A.2d 1197, 1198 (D.C.), *cert. denied,* 488 U.S. 868, 109 S.Ct. 174, 102 L.Ed.2d 144 (1988). For example, the motion asserted that counsel had failed to investigate the scene of the crime, stating that a proper investigation would have "cast doubt" on Officer Johnson's identification of Spencer as the aider and abettor. Aside from the fact that this unsworn assertion was specifically refuted under oath in counsel's affidavit, it failed to explain just how counsel's alleged failure to investigate would have changed the outcome of the trial. The court, considering Johnson's trial testimony as well as defense counsel's affidavit, could permissibly conclude that the allegation was too vague to warrant a hearing. We hold, therefore, that neither part of the two-part *Strickland* test was met and that the trial court committed no error in denying the § 23–110 motion.

V

Appellant Spencer's conviction and the denial of his motion to vacate sentence under D.C.Code § 23–110 are both

*Affirmed.*