97 N.Y.2d 500 (2002)
769 N.E.2d 1266
743 N.Y.S.2d 374
THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v.
TARKISHA BROWN, Appellant.
Court of Appeals of the State of New York.
Argued January 10, 2002.
Decided March 19, 2002.
*501 Legal Aid Society, New York City (Andrew E. Abraham and Andrew C. Fine of counsel), for appellant.
*502 Robert T. Johnson, District Attorney, Bronx (Rafael A. Curbelo, Joseph N. Ferdenzi and Allen H. Saperstein of counsel), for respondent.
Chief Judge KAYE and Judges LEVINE, CIPARICK, WESLEY and ROSENBLATT concur with Judge GRAFFEO; Chief Judge KAYE concurs in a separate concurring opinion in which Judges WESLEY and ROSENBLATT concur; Judge SMITH dissents and votes to reverse in another opinion.

OPINION OF THE COURT
GRAFFEO, J.
In this appeal we are asked to determine whether the trial court abused its discretion in allowing the introduction of expert testimony by a police officer in a criminal trial regarding the general operating methods and terminology used in street-level narcotics transactions. Under the facts and circumstances presented, we hold that the trial court did not abuse its discretion.
An undercover narcotics police officer working in Bronx County approached a group of approximately five or six men congregating in front of a grocery store and, in an attempt to locate a crack cocaine seller, asked them who was "working the rock." Commenting on the officer's disheveled appearance, the group derided the officer as a "crack head" and told him to "get out of here." Another man then exited the grocery store and *503 called over the officer. The officer remarked that he was "really hurting" for drugs, and in reply, the man indicated that he "understood" and asked the officer what he was looking for. When the officer responded that he was "looking for a little rock," the man turned and pointed down the street at defendant, stating "see the girl in the orange shirt? She's working. She [sic] her?"
The officer walked toward defendant and asked if she was selling crack. Defendant began quizzing the officer about whether he had ever before bought drugs in the area. After the officer answered her questions, defendant acknowledged "okay, I got nicks, come on."[*] She then led the officer back to the group of men by the store. Again, the men made disparaging remarks to the officer. Joining in their banter, defendant declared that he looked like a cop and that "no one here knows you." Nevertheless, she asked the officer how much money he had. When the officer told her that he had $20, defendant offered to sell him three bags, advising him she would keep the fourth for herself. The officer agreed, paid defendant $20 in prerecorded buy money and received three bags of what later tested positive as cocaine. As he walked away, the officer turned and observed that defendant remained with the group of men near the grocery store.
After completing the transaction, the officer radioed his back-up team that he made a "positive buy" and described defendant as an African-American female dressed in a bright orange shirt with a blue baseball cap. Another officer arrived at the scene minutes later and discovered defendant, who matched the description. About five minutes after the drug purchase, the undercover officer made a drive-by confirmatory identification of defendant as the seller. Defendant was placed under arrest and searched; however, no prerecorded buy money or drugs were recovered from her person. Because the site of the transaction was within 1,000 feet of two schools, defendant was charged in an indictment with, among other counts, criminal sale of a controlled substance in or near school grounds (Penal Law § 220.44 [2]).
In his opening remarks to the jury, defense counsel suggested that because no drugs or marked money were found on defendant, her arrest was a "mistake" by the police. In response to this misidentification defense, and after presenting *504 the testimony of the undercover and arresting officers, the prosecution sought to call an expert witness, a police sergeant who was not a participant in the drug transaction but had an extensive background in drug enforcement and training. The People intended to offer the sergeant's testimony to assist the jury in understanding a key issuewhy an individual who was accused of selling drugs to an undercover officer might not have either the drugs or prerecorded buy money on his or her person even if arrested soon after the transaction. Defendant objected on the ground that an adequate foundation had not been established for the admission of such testimony. After an extensive colloquy during which the trial court discussed the purpose of the testimony, the voir dire of the sergeant proceeded and the court found the witness to be an expert "in the area of street level narcotics." Before allowing the sergeant to testify, the court gave the jury cautionary instructions concerning the limited purpose of the testimony, emphasizing that it was not being offered as evidence of what actually happened on the day of defendant's arrest.
Under direct examination by the prosecutor, the sergeant stated that he was not present when defendant made the sale and was arrested. In describing street-level narcotics transactions, he referred to the different roles and functions performed by persons commonly involved in street drug sales and how these individuals work together. A "pitcher" was described as the person who physically hands a buyer the drugs; a "money man" handles and protects the money; a "stash man" is responsible for safeguarding and handling the supply of drugs; a "lookout" watches for police and other threats; a "steerer" directs buyers to particular sellers based on what drug a potential buyer is seeking; and a "manager" oversees all these persons. The sergeant also defined certain terminology used by drug sale participants such as "are you working," "stash" and "nicks."
Explaining why buy money and additional drugs are not always recovered by the police in street-level narcotics arrests, the sergeant testified that the members of a narcotics street operation will try to "save the money by moving it, secreting it somewhere else, getting it off the street before [the police] get there * * * so they do everything they can to keep the money from not staying too long in the street or the drugs from staying too long in the street where it can be seized." During cross-examination, the witness conceded that one of the reasons why a person arrested might not be in possession of drugs or prerecorded *505 buy money at the time of arrest is that the individual may have been misidentified and wrongly arrested.
Ultimately, defendant was convicted of criminal sale of a controlled substance in or near school grounds and sentenced to a term of 2 to 6 years in prison. The Appellate Division affirmed the conviction. A Judge of this Court granted defendant leave to appeal and we now affirm.
In People v Lee (96 NY2d 157, 162 [2001]), we recently restated the long-standing general rule that "the admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court." The role of the trial court is to "determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefited by the specialized knowledge of an expert witness" (People v Cronin, 60 NY2d 430, 433 [1983]). In other words, the trial court must decide whether, depending on the facts of each case, the proffered expert testimony would be helpful in aiding a lay jury reach a verdict (see Lee, 96 NY2d at 162; People v Taylor, 75 NY2d 277, 288 [1990]). As part of this process, the purpose for which the expert testimony is being offered must be examined (see Taylor, 75 NY2d at 292).
Here, defendant's primary defense was misidentification. As the basis of that claim, defendant relied on the fact that no prerecorded buy money or drugs were recovered. By presenting testimony regarding the general characteristics and operating methods of street-level drug transactions, the prosecution offered one plausible explanation as to why a person might not possess money or drugs shortly after selling narcotics to an undercover officer; defendant offered another.
Although the average juror may be familiar with the reality that drugs are sold on neighborhood streets, it cannot be said that the average juror is aware of the specialized terminology used in the course of narcotics street sales or the intricacies of how drugs and money are shuttled about in an effort to prevent their discovery and seizure by the police (cf. Lee, 96 NY2d at 162; Cronin, 60 NY2d at 433; Selkowitz v County of Nassau, 45 NY2d 97, 102 [1978]). Testimony of this nature, from a source other than the undercover officer (a fact witness), may be helpful to the jury in understanding the evidence presented and in resolving material factual issues (accord State v Berry, 140 NJ 280, 302, 658 A2d 702, 713-714 [1995]; United States v Diaz, 878 F2d 608, 616-617 [2d Cir], cert denied 493 US 993 [1989]). *506 Just as in People v Taylor (75 NY2d at 292-293), where we permitted the introduction of expert testimony regarding rape trauma syndrome in order to dispel juror misconceptions regarding the behavioral responses of rape victims, the expert testimony in this case was admitted to explain what might seem, to a lay observer, to be an anomalous factthat someone who allegedly sold drugs to an undercover officer did not have money or drugs when arrested shortly thereafter.
When a trial court finds that expert testimony is appropriate, it is incumbent on the judge to determine the scope and extent of the testimony to be offered in light of the evidence before the jury. Here, despite a general objection to the People's offer of expert testimony, defendant did not object to the limiting instruction, nor did she seek to limit the scope of the sergeant's testimony in any way. As to the latter, the court nevertheless properly precluded the sergeant from opining that defendant sold drugs to the undercover officer or even that defendant's specific actions or behavior were consistent with participation in a street drug sale (cf. United States v Boissoneault, 926 F2d 230, 233 [2d Cir 1991]).
Based on our concern that expert testimony be admitted only for a permissible purpose, we hold that this type of testimony must be paired with appropriate limiting instructions. If and when the trial court allows such testimony, it should inform the jury that it is free to reject it and that the testimony being admitted should in no manner be taken as proof that the defendant was engaged in the sale of narcotics. These crucial instructions should be reemphasized in the concluding charge to the jury.
We caution that such expert testimony is not necessarily proper in every drug sale case where a defendant asserts a misidentification defense. Indeed it would be perverse if the very absence of drugs or marked money on the accused served as an automatic basis to introduce expert testimony addressing the general characteristics of street drug transactions. But in this case we disagree with the dissent's conclusion that there was an inadequate factual basis to allow expert testimony on the nature of street-level narcotics transactions. Specifically, the undercover officer detailed the sequence of events and the interactions of the various individuals he encountered before, during and after the cocaine sale. He testified that after he asked the group of men standing by the grocery store who was "working the rock," a man exited the store, called him over and pointed defendant out as someone who was "working." The officer *507 then approached defendant and inquired about the purchase of crack. Defendant acknowledged she had "nicks" and led the officer back to this group of men. Once at the street corner, she conversed with the group in evaluating the officer before finally selling him three packages of crack. She then remained with the men after the sale was consummated. Given this evidence, the trial court did not abuse its discretion in permitting the expert's testimony.
We next turn to defendant's Batson contention (see Batson v Kentucky, 476 US 79 [1986]). It is well settled that, in order to establish a prima facie case of discrimination in the selection of jurors under Batson, a defendant asserting a claim must show that the exercise of peremptory challenges by the prosecution removes one or more members of a cognizable racial group from the venire and that facts and other relevant circumstances support a finding that the use of these peremptory challenges excludes potential jurors because of their race (see People v Childress, 81 NY2d 263, 266 [1993]). When these showings are made, the burden shifts to the prosecution to come forward with a race-neutral explanation for its peremptory challenges.
"There are no fixed rules for determining what evidence will * * * establish a prima facie case of discrimination" (People v Bolling, 79 NY2d 317, 323-324 [1992]). A disproportionate number of strikes used against members of a particular racial or ethnic group may be indicative of a discriminatory pattern, but such a fact is rarely conclusive in the absence of other facts or circumstances. In Bolling, for example, the Batson objection was grounded in both a numerical argumentthat the prosecution peremptorily struck four of five African-Americans in the paneland on the basis that two of the four jurors excused by the People had proprosecution backgrounds. Taken together, this Court found these arguments sufficient to shift the burden to the People (see id. at 325). The absence of other evidence indicating that peremptory challenges were exercised for discriminatory purposes was a consideration in People v Steele, the companion case to Bolling (79 NY2d 317 [1992]). Although three of four prosecution challenges excused African-Americans in Steele, "that alone [was] not sufficient to establish a pattern of exclusion of African-Americans" (id. at 325). Similarly, in Jenkins and Childress, where no showing was made beyond the disproportionate number of strikes of African-Americans, defendants' claims fell short of the requisite burden (People v Jenkins, 84 NY2d 1001, 1003 [1994]; Childress, 81 NY2d at 267).
*508 We join our dissenting colleague fully in his condemnation of invidious discrimination in jury selection. In this case, however, defendant's reliance on the People's removal of seven African-Americans through the exercise of eight peremptory challenges was inadequate, without more, to require the trial court to find a prima facie showing of discrimination. After defendant raised her Batson challenge during the second round of voir dire, the Judge stated that, by his count, nine potential jurors in the first panel and six in the second panel appeared to be African-American and as such the People had challenged 7 of the 15 African-Americans in the venire. Further, four of the seven sworn jurors were African-American.
Defendant was explicitly invited by the trial court to articulate any facts and circumstances that would support a prima facie showing of discrimination. Instead of making "a record comparing Caucasians accepted with similarly situated African-Americans challenged, or by establishing objective facts indicating that the prosecutor has challenged members of a particular racial group who might be expected to favor the prosecution because of their backgrounds" (Bolling, 79 NY2d at 324), defense counsel responded that certain persons excused by prosecution peremptories had no prior jury service or had attended college and, thus, gave no indication that they could not be "fair." Based on the numbers and arguments presented, the trial court ruled that it did not find a discriminatory pattern. No further Batson objection was raised during the remainder of voir dire proceedings. Upon this record, we conclude that defendant's numerical argument was unsupported by factual assertions or comparisons that would serve as a basis for a prima facie case of impermissible discrimination (see Jenkins, 84 NY2d at 1003; Steele, 79 NY2d at 325).
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge KAYE (concurring).
Let there be no doubt: This Court stands as one in its recognition of the prized right of Americans to serve on juries, in its denunciation of invidious discrimination in jury selection and in its commitment to apply the law to assure that objective.
The law, moreover, is clearwell known to Trial Judges and in particular, as the record establishes in this case, well known to the Trial Judge here. To establish a prima facie case of a Batson violation, a defendant must show that the exercise of *509 peremptory challenges by the prosecution removes one or more members of a cognizable racial (in this case) group from the venire, and that other facts and circumstances support a finding that the use of peremptory challenges excludes potential jurors because of their race.
I agree with Judge Graffeo and my Colleagues in the majority that defendant has not satisfied the test. When defendant first raised a Batson challenge, the trial court explicitly invited defense counsel to make the necessary record supporting a finding that the prosecutor was using peremptory challenges to exclude potential jurors because of their race. The Trial Judge pointedly asked defense counsel for "facts and other relevant circumstances to create an inference of exclusion of a cognizable group." That would have shifted the burden to the People to provide race-neutral reasons for its strikes. Defense counsel, however, did not make that showing, arguing instead that challenged jurors had attended college, or had (or lacked) prior jury service. Attendance at college, or prior jury service, does not satisfy the test for a prima facie showing of purposeful discrimination. Many college graduates and former jurors are appropriately challenged. As the Trial Judge made clear, counsel simply had to indicate that accepted jurors had qualities similar to challenged jurors, thereby indicating that race may have had a role, but did not do so.
Experience is indeed a great teacher. My own years on this extraordinary Court, dealing with countless Batson challenges, have brought me far closer to the perception of Justice Thurgood Marshall, that the "inherent potential of peremptory challenges to distort the jury process by permitting the exclusion of jurors on racial grounds should ideally lead the Court to ban them entirely from the criminal justice system" (Batson v Kentucky, 476 US 79, 107 [Marshall, J., concurring]). The intense focus on factors such as skin color, accent and surname in jury selection is wholly at odds with our societal goal of dealing with people as individuals, on their personal qualities.
In this State, moreover, we have both an exceedingly, perhaps uniquely, high number of peremptory challenges, and a requirement that all peremptories be exhausted in order to preserve a claim of error. The opportunity for mischieflet alone the huge, expensive waste of juror timetherefore abounds. My nearly 16-year experience with Batson persuades me that, if peremptories are not entirely eliminated (as many have urged), they should be very significantly reduced.
SMITH, J. (dissenting). Because I believe that the admission of expert testimony was unwarranted, prejudicial and unfair to *510 the defendant and because I believe further that the defendant established a prima facie case of racial discrimination which required the prosecutor to explain his peremptory challenges, I dissent.
Defendant was found guilty, after a jury trial, of the criminal sale of a controlled substance in or near school grounds in violation of Penal Law § 220.44 (2). The prosecution introduced evidence that the defendant, when approached by an undercover police officer, asked the officer what he wanted, and he answered four bags. The defendant allegedly reached into the waistband of her sweat pants, took out four bags and told him that she was keeping one for herself. The officer gave her $20 for the bags. Prior to the officer obtaining the crack cocaine, he had been ridiculed when he approached several men on a corner and asked them where he could obtain drugs. The officer was in a torn and dirty outfit and some of the men stated that he was a crackhead or a cop. A male allegedly pointed out the defendant and told the undercover officer that he could obtain drugs from her.
The defense in the case was mistaken identification. The defendant testified that she never sold crack cocaine. She stated that she had been with several girlfriends and that she went into a store to get change to use a public telephone. When she returned to the public telephone, she was arrested. No drugs or marked money were found on her. She had no prior criminal record.

Expert Testimony
Expert testimony is properly admitted to assist lay persons to understand matters that are not ordinarily within their understanding. Here, whatever the articulated reason for the introduction of the evidence, it was prejudicial and tipped the scale against the defendant. It should be remembered that defendant was not accused of a drug conspiracy or of being part of a drug organization. Yet, the effect of the admission of this evidence was to do just thattie the defendant, without evidence, to a drug organization. No other person allegedly associated with defendant in the drug transaction was arrested.
In the expert testimony, a police officer described an organization selling drugs. He stated that the "pitcher" is a person who actually hands out the drugs, the "money man" keeps and protects the money, the "stash man" protects the narcotics, the *511 "lookout" watches for police or anyone else who might cause a problem, the "steerer" points out the person who has the drugs and the "manager" manages everybody. The effect of the testimony was to accuse defendant of being a participant in the organization.
There was no necessity for this expert testimony. In effect, all the expert testimony did was to suggest to the jury, again without proof, how defendant got rid of the marked money, the retained packet of cocaine she refused to give to the officer and any other drugs in her sweat suit. In admitting the expert testimony, the Trial Judge stated that he would give "a limiting instruction to the jury as to the purpose of the testimony and that the testimony is not being offered by anyone who was present who can say that this is what happened but it's being offered to propose as a contention of the People an explanation as to why there's no buy money recovered or stash." This, in my view, reduced the People's burden in the case. If the People contend that defendant was acting with someone else, they ought to prove it, not speculate upon it.
During summation, the prosecutor implied that the defendant was part of a drug organization. His words were as follows:
"But you now know, ladies and gentlemen, after hearing the testimony of both Detective Farro and the additional testimony of Sergeant Gary McDonald [the expert] * * *, there was about a four minute period that went by where nobody saw what the defendant was doing, that nobody saw where she went, that nobody saw who she was talking to, nobody saw whether she went into the grocery store.
"You heard from Sergeant McDonald, he explained to you the nature of these types of operations, the nature of the street level drug trade.
"He explained to you what can happen to the prerecorded buy money, to additional drugs.
"Is that evidence in this case? For the substance of this case, of course not.
"Does it raise plausible reasons as to what may have happened to the prerecorded buy money? Of course it does, of course."
*512 In its charge to the jury, the court stated that the expert's testimony was based on facts the expert was asked to assume. The court further charged the jury that Sergeant McDonald "was allowed to express his opinion concerning how street level drug sales are conducted." The court also charged the following:
"He wasn't testifying based on actual observation. [He] wasn't testifying as to what he actually observed or what actually occurred but he was testifying in an area that would otherwise be not known to the jury.
"It does concern a fact in issue and he was offering an explanation with regard to buy money and additional narcotics and this was the limited purpose for his testimony."
Thus, in this case, the introduction of expert testimony was prejudicial, first, because it nullified the presumption of innocence by replacing it with a presumption of guilt in which the jury was given information on how defendant got rid of marked money and drugs. Moreover, the introduction of the expert testimony shifted the burden of proof from the prosecution to the defendant, requiring her to explain why the expert's statements did not apply to her and leaving the jury to conclude that she had no explanation.
Expert testimony, similar to that admitted here, is admissible in some drug cases to explain to the jury some aspect of the case. For example, the standard in New Jersey for allowing such evidence is rule 702 of the New Jersey Rules of Evidence, which, in pertinent part, is identical to rule 702 of the Federal Rules of Evidence, and reads as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." First, the New Jersey rule requires that the testimony concern a matter which is beyond the ken of the average juror, the subject must be such that the expert's testimony may be considered reliable and the witness must have sufficient expertise to testify concerning the subject (State v Berry, 140 NJ 280, 289-290, 658 A2d 702, 706 [1995]).
Second, the facts of the case must lend themselves to expert testimony. Thus, in State v Cannon, decided with State v Berry, the evidence was that defendant Cannon gave drugs to a person *513 in return for money. Cannon then handed the money to another person. When Cannon was arrested, he had neither drugs nor money. The New Jersey Supreme Court permitted expert testimony, including testimony about the purpose of a "money man."
Cases in the District of Columbia have permitted expert testimony under similar factual circumstances. In Thompson v United States (745 A2d 308 [DC Ct App 2000]), Thompson was observed handing something which turned out to be drugs to his codefendant who was also observed dropping the object to the floor of the vehicle they were sitting in. In Spencer v United States (688 A2d 412 [DC Ct App 1997]), the two defendants were conversing with each other when they were approached by the undercover police officer, and they each responded to the officer's request for drugs, "a fact which strongly suggests that the two were acting in concert" (id. at 415). In Blakeney v United States (653 A2d 365 [DC Ct App 1995]), one defendant acted consistently with being a lookout and the other defendant actually gave the drugs to the undercover officer. In Lowman v United States (632 A2d 88 [DC Ct App 1993]), one defendant took the undercover police officer to the other defendant, who, when asked, responded that he had drugs and directed them to wait while he proceeded to get the drugs.
In United States v Brown (776 F2d 397, 400 [2d Cir 1985], cert denied 475 US 1141 [1986]), the Second Circuit allowed a police expert to testify that drug sales in Harlem usually involved two to five people and that one person is employed as a steerer to determine whether the buyer is an addict or cop. In this transaction, however, there was actual conversation between the initial seller and the steerer, evidencing the conspiracy and providing a foundation for admitting expert testimony. The police expert also was allowed to testify that defendant was exercising the role of a steerer.
Thus, expert testimony of this kind should be limited to cases where there is sufficient incriminating evidence of more than one person being involved in a drug transaction or sufficient incriminating evidence of a drug organization. Here, the evidence is insufficient. Defendant had no conversation or interaction with the man exiting the store. That she joined the group of men in bantering with the undercover officer is not enough.
In addition, the expert was allowed to testify to matters that were not beyond the understanding of the average juror. It is true that average jurors may be unfamiliar with the specialized *514 terminology used in narcotics street sales, such as "nicks" or "working the rock." Such testimony is indeed helpful to the jury. But as the majority concedes, drug dealing in neighborhood streets is an altogether familiar scene to average jurors, particularly the average urban juror. It is a scene that is part of the "day-to-day experience." It is not beyond the average juror's understanding that drug dealers would "do everything they can to keep the money [or drugs] from * * * staying too long in the street where [they] can be seized" by the police. That drug dealers on neighborhood corners would minimize the risk of getting caught with drugs or prerecorded buy money by assigning a "money man," a "stash man," or "steerer," is within the understanding of the average juror. This is not the kind of intricate drug operation requiring the explanation of an expert police officer. In the absence of an allegation that defendant was part of a conspiracy, this kind of expert testimony should not come in.
This case is distinguishable from People v Taylor (75 NY2d 277 [1990]), where we allowed expert testimony to explain why a rape victim would be unwilling to identify the defendant as the man who raped her, and why she had not seemed upset following the attack. Rape, we found, "is a crime that is permeated by misconceptions" (id. at 288). The patterns of response among rape victims are not within the ordinary understanding of the lay juror, because "cultural myths still affect common understanding of rape and rape victims" (id. at 289). In this case, there is no claim that the lay jurors' understanding of the drug operation, of which defendant was allegedly a part, is permeated by misconceptions.

Racial Discrimination
It is also clear that the defendant made out a prima facie case of racial discrimination which required the prosecutor to give racially neutral reasons for peremptorily excluding the jurors. The exclusion of African Americans from juries has long been a problem in American courts. Few problems have been as great a threat to the fairness of the American jury system as the exclusion of African Americans on a racially discriminatory basis (Strauder v West Virginia, 100 US 303 [1879]). In recent years, both the Supreme Court of the United States and this Court have sought to protect the right of African Americans to serve on juries (Batson v Kentucky, 476 US 79 [1986], overruling Swain v Alabama, 380 US 202 [1965]; People v Kern, 75 NY2d 638 [1990]). In fact, Kern held both that the exclusion of *515 African Americans from juries violated the Equal Protection Clause of the New York State Constitution (art I, § 11) and that jury service is a civil right (art I, § 1; see also People v Allen, 86 NY2d 101, 108 [1995]). This Court stated in Kern:
"Jury service, by contrast, is a civil right established by Constitution and statute. First, jury service is a `privilege[] of citizenship' secured to the citizens of this State by article I, § 1 of the State Constitution. Service on the jury has long been recognized to be both a privilege and duty of citizenship * * *. Indeed, it is because jury service is a means of participation in government that, in the words of Mr. Justice Black, `[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concept of a democratic society and a representative government' (Smith v Texas, 311 US 128, 130)" (75 NY2d at 651-652 [citations omitted]).
The evidence was sufficient to require some explanation from the prosecutor. In the first round of jury selection, 15 jurors were subject to peremptory challenges. The record indicates that 9 of the 15 were African American. Of this number, eight were challenged, six by the prosecutor and two by the defense. Of the six, five were African Americans. Seven were seated as jurors. The prosecutor thus used 83% of his challenges against African Americans who constituted 60% of the initial jury venire. These numbers alone are sufficient to raise a prima facie case of jury discrimination requiring some explanation from the prosecutor.
In the second round, 6 of the 15 jurors were African American. After questioning of the second round of jurors was completed, the prosecutor peremptorily struck two African American jurors of the five jurors being considered. At that point, the prosecutor had made eight challenges, seven of which (87%) were against African Americans. The defense attorney then challenged the prosecutor's striking of African Americans from the jury. While recognizing that a challenge could be made to the striking of even a single juror, the trial court *516 refused to require an explanation of the prosecutor's use of eight challenges to strike seven African Americans. The record indicates that four of seven seated jurors were African American when the challenges were made.
While the numbers alone established a prima facie case, the defense attorney presented additional reasons why the striking of African Americans could not be upheld. For example, as to the first prospective juror, the defense counsel stated that the juror had no prior jury experience, had no prior relations with the police, had two years of college and gave no answers that would call into question her qualifications to serve on the jury. Prospective juror number four had a Bachelor of Arts degree in psychology and gave no indication that he could not be fair. Another challenged prospective juror was a single woman with two years of college who helped her mother and brother at home and had no prior jury experience. A fourth prospective juror had worked at the Offtrack Betting Corporation for 30 years, had served on many juries and was not asked a single question by the prosecutor.
Both Batson and Kern require that a defense attorney or prosecutor seeking to challenge the peremptory jury strikes by the other must first establish a prima facie case of jury discrimination "by showing that the prosecution [or defense attorney] exercised its peremptory challenges to remove one or more members of a cognizable racial group from the venire and that there exist facts and other relevant circumstances sufficient to raise an inference that the prosecution used its peremptory challenges to exclude potential jurors because of their race" (People v Childress, 81 NY2d 263, 266 [1993]). The prosecution must then answer the challenge by giving race neutral reasons for the peremptory strikes. The court may then determine if those reasons are pretextual (People v Allen, 86 NY2d at 109-110).
A prima facie case may be established by statistical evidence alone, by a pattern of strikes, by questions and statements made by the prosecution during voir dire, by comparing rejected African Americans to similarly situated Caucasians and by identifying excluded African Americans who, because of their background or experience, could be expected to favor the prosecution (see Batson v Kentucky, 476 US at 97; People v Hawthorne, 80 NY2d 873 [1992]; People v Bolling, 79 NY2d at 323-325). In Batson, the Court stated that in making a determination of whether or not a prima facie case had been made out, it should be remembered that those of a mind to discriminate will do so (476 US at 96).
*517 It is unquestionable that statistics alone may be a sufficient reason for requiring some explanation from a prosecutor. In People v Hawthorne (80 NY2d at 874), this Court modified an Appellate Division order by remitting the matter to the trial court. This Court agreed that defendant had made a prima facie showing of race discrimination in pointing to the fact that the prosecutor challenged four of six African American venire persons.[*] This Court remitted because the prosecutor was not asked to provide a racially neutral reason for one of the challenged jurors in question. This Court concluded that if a satisfactory explanation were provided by the People, the judgment of conviction should be amended to show the result. Otherwise, the judgment of conviction should be vacated and a new trial ordered.
In People v Bolling (79 NY2d at 322), 16 persons were originally put into the jury box. Five of the first 12 jurors were African American. The prosecutor peremptorily challenged five jurors, four African Americans and one Asian. The defense attorney then struck the other African American and three non-African American jurors. At this point, the defense attorney objected to the prosecutor's challenges as racially motivated. The court did not rule on the challenges. The four remaining jurors of the original venire were seated; two of the four were African American. This Court remanded the case to Supreme Court for the People to provide race neutral reasons for their challenges, failing which, the conviction was to be vacated and a new trial ordered.
In People v Jenkins (75 NY2d 550, 556 [1990]), this Court agreed with the Appellate Division that a prima facie case of juror discrimination had been shown when the prosecutor used 10 peremptory challenges, 7 of which were used to strike 7 of the 10 African Americans on the venire, while only 3 challenges were used against the 37 non-African Americans.
The ruling by the Trial Judge that he did not believe a pattern had been shown that would require a prosecutor to respond with race neutral reasons was also in error. It is inconsequential that four African Americans had been chosen *518 to sit on the jury at the time the Batson challenge was made, and it makes no difference to the ruling challenged here that African Americans sat on the jury (People v Bolling, 79 NY2d at 321-322). The exclusion of a single juror based on race is impermissible (id.).
The differences between the majority and the dissent are clear. First, the majority contends that a prima facie case was not established. When the defense attorney made his challenge to the actions of the prosecutor, the record more than adequately established a prima facie case. It showed the number of African Americans among the first 30 prospective jurors and the prosecutor's action in striking African Americans. In People v Bolling, this Court stated that a challenge on a racial basis did not have to wait until the end of jury selection but could, and should, be raised at any point during the process.
In People v Kern, the case in which this Court applied Batson to peremptory challenges by the defense, this Court upheld the action of the trial court in requiring race neutral reasons for peremptory strikes by the defendant in the midst of jury selection and without a requirement that the race of all prospective jurors be ascertained (75 NY2d 638 [1990], affg 149 AD2d 187, 222-237 [1989]). In fact, the prosecution argued, after the first round of jury selection, that the defense was striking prospective jurors on the basis of race. While that initial challenge was rejected by the trial court, the Batson challenge was upheld before the second round of jury selection was completed.
In People v Bennett (186 AD2d 812, 812 [1992]), the Appellate Division concluded that the "defendant has established a prima facie case of purposeful discrimination in the jury selection by the prosecutor, who exercised her peremptory challenges in the first three rounds of the voir dire to exclude 7 out of 11 [African Americans] from the jury, or nearly 64% of the prospective [African American] jurors. The prosecutor challenged only 36% of the non [African Americans] during those rounds * * *." The Court remanded the case for the prosecutor to give race neutral reasons for the challenges. On appeal after the remand, the Appellate Division reversed the conviction and ordered a new trial based on a determination that some of the prosecutor's reasons for peremptory strikes were "pretextual, and insufficient" (People v Bennett, 206 AD2d 382, 384 [1992]).
In People v Vega (198 AD2d 56, 56 [1993], lv denied 82 NY2d 932), the People "established a prima facie case of purposeful *519 racial discrimination in the use of peremptory challenges when they established that the defense used 7 of its 8 challenges to exclude all but one of the white persons on the panel of 16." In People v Harris (283 AD2d 520, 520 [2001]), the People "established a prima facie case of discrimination" when the "defense counsel peremptorily challenged four of the five remaining white venirepersons in the second round of jury selection."
Moreover, a defendant is not obligated to include the race of all jurors in the entire panel from which jurors are to be selected before an adequate assessment of discriminatory practices can be made, even when a defendant is relying heavily or primarily upon the exclusion of a disproportionate number of persons of a particular ethnic group. Nor has this Court stated that there must be a comparison of the characteristics of African American jurors and Caucasians before an adequate assessment of a prima facie case can be made.
Second, the majority states that more than statistical evidence was needed here to make out a prima facie case. In several cases, this Court has stated that a disproportionate number of challenges against African Americans may be sufficient to raise an inference of jury discrimination (People v Childress, 81 NY2d at 267; People v Hawthorne, 80 NY2d at 874; People v Bolling, 79 NY2d at 324; People v Jenkins, 75 NY2d at 558). The striking of a disproportionate number of African Americans may also establish, prima facie, a pattern of strikes (Batson v Kentucky, 476 US at 97; People v Jenkins, 75 NY2d at 556). Moreover, the defense attorney went into the qualifications of at least some of the excluded prospective jurors. Those qualifications included the fact that none of the prospective jurors gave answers that would disqualify them from jury service. All appeared to be citizens with both work and educational experiences. Their qualifications indicated that they were not unsuited for jury service (see People v Jenkins, 75 NY2d at 556).
Third, as we enunciated in Kern, jury service is a civil right that only a court can protect at the trial stage. Of course, a defendant may still raise the issue of jury service as a civil right on appeal. Considering that we are dealing with the right of African Americans, as well as people of all races, to serve on juries, a constitutional civil right, establishing a prima facie showing of discrimination should not require more than what defendant established in this case. To require more is unwarranted, particularly when viewed in proportion to the minimal *520 showing (any racially neutral reason) required by the prosecutor to rebut the presumption of discrimination (see People v Allen, 86 NY2d at 109). As this Court stated in People v Jenkins:
"Surely, jurors dismissed because of their race will leave the courtroom with a lasting impression of exclusion from jury participation and perhaps of isolation from mainstream society generally * * *. No argument based on percentages of the population would remove from these excluded prospective jurors the sense of exclusion resulting from being assumed to be incompetent to sit on a jury solely because of their race" (75 NY2d at 558).
Since jury service is a civil right, courts have an obligation to see that persons are not excluded from juries on a racial basis.
Accordingly, both because the expert testimony rendered the trial unfair and because the prosecutor should have been required to give race neutral reasons for his exclusion of African Americans from the jury, I dissent.
Order affirmed.

APPENDIX
A small sample of the many cases indicating that statistics alone are sufficient to establish a prima facie case will show that a prima facie case was established here. They include the following:
Linscomb v State (829 SW2d 164 [Tex Crim App 1992]):
Out of a pool of 32 venire members, 6 of whom were African Americans, prosecutor used 4 of 10 peremptory challenges to strike African Americans. The two other African Americans were seated.
Snow v State (800 So 2d 472 [Miss 2001]):
Prosecutor used eight of eight peremptory challenges against African Americans. The prosecution was required to give race neutral reasons for the strikes. The seated jury was less than 17% African American out of a venire that was at least 46% African American. Defendant was African American and the victims were White. The conviction was affirmed.
*521 Hall v Daee (602 So 2d 512 [Fla 1992]):
The striking of four out of five African American venire members, with nothing in the record adequately explaining the challenges, established a prima facie case. Six of the 35 venire members were African American, and one served on the jury.
Capitol Hill Hosp. v Baucom (697 A2d 760 [DC Ct App 1997]):
Defendant used peremptory challenges to remove three prospective White jurors, ensuring that the resulting jury was all African American.
Turner v Marshall (63 F3d 807 [9th Cir 1995], cert denied 522 US 1153 [1998], overruled on other grounds by Tolbert v Page, 182 F3d 677 [9th Cir 1999]):
Prosecutor exercised 56% (five out of nine) of his or her challenges against African Americans, who comprised about 30% of the venire.
United States v Alvarado (923 F2d 253 [2d Cir 1991]):
Prosecutor struck 50% of the non-White jurors (three of six), who constituted 29% of the venire. Approximately four of seven challenges were used against minorities.
State v Watkins (114 NJ 259, 553 A2d 1344 [1989]):
Prosecutor exercised peremptory challenge against every African American juror except one who was challenged for cause. In Burlington County, African Americans made up 10% of the population. The prosecutor used 9 of 12 peremptory challenges and struck all three African Americans.
United States v Horsley (864 F2d 1543 [11th Cir 1989]):
Prima facie case of purposeful discrimination could be established where prosecution used peremptory challenge to strike the single African American venire person on the panel.
NOTES
[*] Trial testimony revealed that a "nick," or "nickel bag," is a quantity of drugs sold for $5.
[*] Specifically, this Court stated: "Defendantpointing to the fact that the prosecutor peremptorily challenged four of the six African-American members of the venirecontends that he has made a prima facie showing that the prosecution exercised its peremptory challenges in a racially discriminatory manner, and that the burden therefore shifted to the prosecution to come forward with racially neutral reasons for the strikes (see, Batson v Kentucky, 476 US 79, 96; People v Bolling, 79 NY2d 317). We agree." (Id.)